## THE KEOKUK.

1. The law creates no maritime lien on a vessel as security for the performance of a contract to transport a cargo, unless some contract of affreightment has been made.

2. Such a contract cannot be implied against a transportation company from the fact that a man has loaded a barge belonging to the company, by means of his own men, without any knowledge by the company of what he has done, and then delivered bills of lading to the agent of a steamer of the line, the agent at the moment being very much engaged with other matters, just before the steamer, which it was expected by the shipper would tow the barge, sets off; no sufficient statement being made by the shipper, when so delivering the bills, what bills they are, and the agent himself having no knowledge of what has been done in the particular case, nor of the contents of the bills.

APPEAL from the Circuit Court for the District of Wisconsin; the case being this:

· The La Crosse and Minnesota Steam Packet Company were, during the year 1865, owners of the steamer Keokuk and of several barges, including one named the Farley, which were running on the Mississippi River between La Crosse and Winona, and engaged in carrying freight. On the 23d of October, in that year, the Keokuk towed the barge Farley to Winona, and left her moored at the dock at that place, not however in any one's charge. On the 27th, at about five o'clock in the afternoon, one Robson, a shipper at Winona, getting on the barge, took her to the elevator near by, and with his own men, loaded her with wheat to be shipped to La Crosse. He did not ask permission of the master of the Keokuk to load the barge, nor inform either him or any other person of his intention to load her. He had, however, previously, at times, taken possession of barges and loaded them, and they were afterwards towed by the packet company to La Crosse; he had done this by permission of the officers of the packet company, but had never had permission to do it from the captain then in command of the Keokuk.

The Keokuk did not arrive at Winona from La Crosse

that night until after dark. The night was a very stormy
night, and it was snowing hard. The vessel landed at what
was known as the lower landing, about fifty rods from the
elevator, where the barge then was, and after unloading put
off again at about twelve o'clock at night for La Crosse.
While the boat was laying where she was, the bookkeeper
of Robson came to her second clerk, who was " very busy
checking off freight," in the dark in the storm, a lantern in
one hand and his book in the other, and handed to him two
papers, saying, " Here are the bills of that barge." The
clerk took them with some assenting remark, and put them
in his pocket without opening them; " so that the rain should
not spoil them." There was no explanation what bills the
bills were, and nothing further took place between the par-
ties. No book was presented to the clerk to sign and no
receipts asked for. This clerk subsequently laid the bills
on the first clerk's desk in the boat, the place where he
usually put bills. He was not positive, but he thought that
when he put them there he said to the first clerk, " Here are
those bills." He did not himself know their contents. No
other notice than that already mentioned was given to the
officers of the boat that the barge had been loaded, and none
of the officers were aware of the loading of the barge until
they were one-third of the way back to La Crosse. The
papers were then discovered to be memorandum bills of
lading of the barge. The barge was not watched by Rob-
son, and in the morning it was found sunk at the dock where
he had left it. Thereupon Robson filed a libel in the District
Court of Wisconsin against the steamer, the barge, and the
packet company, charging that the barge was unseaworthy,
and that the cargo was lost by carelessness of the master and
officers of the steamers. There was no proof to sustain the
charge of unseaworthiness.

The District Court decreed for the libellant; the Circuit
Court affirmed the decree. The packet company appealed.

*Mr. J. W. Cary, for the appellant:*

The law creates no lien on a vessel as a security for the

Opinion of the court.

performance of a contract to transport a cargo, until a cargo is shipped under it.   In *Vandewater* v. *Mills*,* this court says: " Maritime liens are *stricti juris*, and will not be extended by construction.   The obligation between the ship and cargo is mutual and reciprocal, and does not take place till the cargo is delivered on board."   Now here there was no sufficient delivery.

*Mr. Emmons, contra :*

The rule, as laid down by this court, in the case cited by Mr. Cary, is explained by it in *Bulkley* v. *The Naumkeag Steam Cotton Company.*†   There the master receipted for a hundred bales of cotton, to be carried on his vessel, and placed it on a lighter, of which he had control, to be transferred from the warehouse in the city of Mobile, to his vessel, lying outside the bar.   The cotton was lost by fire on the lighter before reaching the vessel.   It was held that a delivery of the cotton to the lighterman was a delivery to the master, and bound the vessel.

Mr. Justice DAVIS delivered the opinion of the court.

It is a principle of maritime law that the owner of the cargo has a lien on the vessel for any injury he may sustain by the fault of the vessel or the master; but the law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until some lawful contract of affreightment is made, and the cargo to which it relates has been delivered to the custody of the master or some one authorized to receive it.‡   The inquiry then arises whether there was any contract to carry the wheat in question, and, if so, was the barge containing it delivered to the custody of the steamer?   It is very clear, had the steamer taken the barge in tow, the lien would have attached, although the bills of lading were not executed, because the act of towing the barge would be evidence that the grain was received, and

---

* 19 Howard, 82.                    † 24 Id. 386.
‡ Schooner Freeman *v.* Buckingham, 18 Howard, 188.

that there was a contract to carry it safely. And the steamer would be equally liable if the barge had been left at the landing by the fault of the officers of the boat. But the evidence not only fails to prove this, but establishes the contrary conclusion. The only witness on the part of the libellant, whose testimony has any bearing on the subject, is his bookkeeper. He says, that on the night in question he gave to the second clerk of the steamer, who was on the levee checking freight, two bills of lading, with the statement (of this he is not positive), "These are the bills of that barge," to which the clerk made some assenting remark. But the clerk denies that he knew the contents of the papers when handed to him, or that anything was said at the time from which he could infer their contents. And his subsequent conduct shows that the observation of the bookkeeper, if any was made, failed to arrest his attention; for he put the papers in his pocket and remained on the levee until he had completed his work, and afterwards, without examining them, placed them in the condition in which they were received by him on the desk of the first clerk.

If he is not mistaken in his recollection, that the first clerk was present on the occasion, and that he told him "here are the bills" (which is very doubtful from the evidence), yet it is manifest the first clerk attached no importance to the bills, for he did not notice them until after daylight, when the Keokuk was far on her way to La Crosse. Each clerk, doubtless, acted on the supposition that the other knew to what particular freight the bills related, but it seems both were equally uninformed concerning them. It is not pretended that in any other way than this, was any information conveyed to any one connected with the boat of the intended shipment of grain by the libellant. Neither the master, nor any person on the steamer, or in the employment of the company, had notice that he had taken the barge and loaded it with grain, or that he contemplated doing so. If it be conceded the course of business between the two parties justified him in taking possession of the barge and loading it, without the direct permission of the master, yet it falls far

short of showing that the barge, when loaded, was considered in the custody of the steamer without notice to any of her officers. Indeed, it would be unreasonable to suppose the parties dealt with each other on any such understanding, for it would place the advantage altogether on the side of the shipper, who would be relieved of care and risk as soon as the barge was filled with grain, and the master could exercise no discretion about receiving it.

As there was, then, no agreement in this case which changed the legal rights of the parties, it is clear the steamer is not subject to a maritime lien. The wheat and barge were, at the time of the accident, in the control of the libellant, and their custody was not changed by handing unsigned bills of lading to the second clerk of the steamer, who did not know their contents, nor had any reason to suppose they related to the barge Farley. It was the misfortune of the libellant that he transacted his business so loosely, and if it be the corporation is somewhat to blame for this, the steamer has not on that account committed any fault for which she is chargeable in admiralty. As no one in her behalf contracted with the libellant to transport the barge to La Crosse, and as he did nothing to transfer the possession to the steamer, the libel cannot be sustained.

The case of *Bulkley* v. *Naumkeag Cotton Company* is cited in opposition to the views we have presented, but it is not applicable. There the goods were delivered to a lighter in the control of the ship; here the shipper took control of the barge, and did not deliver either barge or cargo to the steamer.

The decree of the Circuit Court is REVERSED, and this cause is remanded to that court with directions to

DISMISS THE LIBEL.