THE S. L. WATSON. (Nos. 431, 432.)

THE THOMAS P. SHELDON. (No. 433.)

(Circuit Court of Appeals, First Circuit. November 20, 1902.)

1. SHIPPING—VALIDITY OF CHARTER—AUTHORITY OF AGENT.

Authority given an agent by a shipowner, who was a nonresident, to "look after" certain barges employed in the general carrying trade, to make contracts for their services, collect freight, etc., is not to be so narrowly construed as to render invalid a charter for the carrying of five cargoes by two of the barges, to be performed within two months, which was accepted and acted upon by the charterer in good faith.

2. SAME—WAIVER OF TIME BY CHARTERER—DUTY OF OWNER TO MAKE DEFAULT GOOD.

The owner of certain vessels was in default in the provisions of a charter to carry a number of cargoes within a specified time, and thereupon, the charterer having consented to a substantial performance within a reasonable period of time not specified, it was incumbent on the owner, in order to avoid the effect of his default, to use reasonable efforts to make good the default, so that the mere fact that certain vessels substituted by him for that purpose might have been subjected to some delay in loading would not justify him in refusing to load after the cargoes were ready and tendered to the vessels.

3. SAME—DAMAGES FOR BREACH.

While negotiations were pending between the owner of vessels in default on a charter party and the charterer, looking to a substantial compliance with the charter, the market for freights advanced. Thereupon, after the negotiations were broken off, the charterer, having been compelled to charter other vessels, was entitled to be compensated in damages on the basis of the intervening advance.

4. ADMIRALTY—EFFECT OF MISJOINDER.

A decree in admiralty will not be reversed on appeal because of a misjoinder of causes of action in the libel, where one was dismissed by the court, either on exceptions or on final hearing, and a decree on the merits entered upon the other only. Where the final condition of the record is in accordance with the substantial rules of the law, a court of admiralty does not look at the intervening steps.

5. MARITIME LIENS—BREACH OF CHARTER.

Although the owner may contract in a single charter for the carriage of a number of cargoes by one or by a number of vessels, the vessels themselves are not bound so as to be subject to a lien for a breach of the charter so far as it remains wholly executory; nor are they in any case bound for each other, or with respect to any cargo not received on board, although they may have entered on a performance of the contract by carrying one or more cargoes.

Appeal from the District Court of the United States for the District of Rhode Island.

Frederic Dodge and Harrington Putnam, for Lake Shore Transit Co.

Edward E. Blodgett and Addison C. Burnham (Eugene P. Carver, on the brief), for Virginia Iron, Coal & Coke Co.

Before PUTNAM, Circuit Judge, and ALDRICH and LOWELL, District Judges

PUTNAM, Circuit Judge. These appeals arise out of a breach of a written contract designated a "charter party," dated on July 26, 1899, by which one Mr. Stanwood, as agent for J. C. Gilchrist, the

118 F.—60

owner of the barges, and the claimant, who did business under the style of Gilchrist Barge Company, contracted that the barges Thomas P. Sheldon and S. L. Watson should transport five cargoes of coal from Lambert's Point, in Norfolk, Va., to Providence, R. I., at 80 cents per ton. The cargoes were to be delivered in Providence previous to October 1st. It was stipulated that the barges should "take turn in loading, as customary," and that, in case coal was not ready to load them when they reported for cargo, within a reasonable time, the owners should have the option of loading on other coal, and returning next trip to load under the charter. Forty dollars per day demurrage in case of detention of either barge by default of the charterer was also agreed on.

The first contention on the part of Gilchrist is that Stanwood had no authority to tie up the barges for five voyages. Gilchrist lived and did business at Cleveland, Ohio. The barges originally were engaged in lake navigation, but they had been sent to the Atlantic coast, and had been left without steady employment. Stanwood lived at Boston, where the charter party was negotiated and made. In a letter from Gilchrist to the representative of the charterer, who is the libelant, dated on October 23, 1899, in reference to the questions involved in these appeals, he wrote as follows:

"I think, if you will see Stanwood, that you can fix the matter up with him, if he is in any way at fault. I am most too far away from Boston to know just what to do."

This letter, in connection with the other facts, shows that the circumstances called for a broad authority with reference to the employment of the barges. That authority was contained in the following agreement of July 24, 1899:

"Cleveland, O., July 24, 1899.

"We have this day arranged with A. Stanwood, of Boston, Mass., to look after the barges F. A. Georger, Moonlight, Charles Foster, T. P. Sheldon, S. L. Watson, M. S. Bacon, Verona, and W. S. Crosthwaite, now on the Atlantic coast, for us, and to allow him ten dollars ($10.00) each per month for the eight barges, beginning August 1st. Also a further compensation of 6% (six per cent.) of the net earnings of the barges. By the net earnings we mean what is left after all the bills are paid; and 6% (six per cent.) interest on a valuation of $120,000.00, and 10% (ten per cent.) for insurance on the same valuation, is deducted as an additional expense.

"Stanwood is to collect all freights promptly, and deposit same in the National Bank of the Redemption at Boston, to the credit of the Coal & Iron National Bank of Cleveland. He is to make no charge for commissions for the securing of the cargoes for the above barges, unless he cannot get his cargo direct, and is obliged to pay a broker a commission to secure it.

"This contract can be terminated any time that I may so desire.

"J. C. Gilchrist.

"Accepted by A. Stanwood."

Immediately on the barges being chartered, Stanwood telegraphed to Gilchrist as follows: "I have chartered Watson and Sheldon eighty Providence and tug has left." There was no reply to this, and no inquiry by Gilchrist as to the terms of the charter; and, although it is conceded that one voyage was made under it, and payment was received for the freight thereof, no objection was made by Gilchrist until a letter from him of October 17, 1899, to the representatives

of the charterer, which was after the present controversy arose. In this he said that Stanwood had no authority to tie up any of the tonnage for more than a trip at a time. He also referred to the expression "beginning August 1st" in his contract with Stanwood.

As, under the circumstances, it is evident that a contract so loose and informal as that of July 24th, on which both Stanwood and innocent parties had acted, must be construed to sustain such action, if reasonable to do so, the expression "beginning August 1st," is, easily disposed of, as pertaining only to the time from which the monthly compensation should be computed. In the same way the sweeping expression in the contract "to look after the barges" can properly be held to have given Stanwood large discretion as to the method of chartering them, provided nothing unreasonable was attempted by him. It is too clear to need detailed remarks in regard thereto that, looking at the nature of the business, and the season of the year, and the character of the business involved, it was quite as reasonable for Stanwood to have arranged by one charter for a certain number of voyages within a limited time of about two months, as to have stipulated in several charters for voyages one on the heel of another. In order to keep the barges steadily employed, he would have been obliged to do one or the other, even under the strictest terms of his authority; and it would be unreasonable to hold that Gilchrist intended his property should remain unemployed. However, the contract between Gilchrist and Stanwood can easily be construed to sustain the charter party before us, and therefore, according to settled rules, it should be so construed, if necessary, to uphold what was done, if not unreasonable, between Stanwood and innocent parties.

We reach this conclusion without going into the question of ratification, although, on ordinary principles, if Gilchrist, on being informed as to the charter party, saw fit not to inquire into its terms, he must, for the just protection of the charterer, be assumed to have been content to rely on Stanwood, and thus, under the circumstances, to be held estopped from afterwards disputing, to the prejudice of the charterer, what was done.

The parties agree that the Sheldon performed one voyage under the contract. It is claimed by Gilchrist that the Watson performed one thereunder, but this is denied. The charterer admits that the Watson performed a voyage, but claims that it was under a prior oral charter for a single trip, also made by Stanwood. Aside from these voyages, neither barge performed any, and Gilchrist was in fault in that respect, without any justification, or even excuse, therefor. Therefore Gilchrist must be held to have been a willful violator of his contract in this particular, and the remaining facts in the case are to be scrutinized and weighed from that standpoint.

The district court found, as claimed by the charterer, that no voyage was performed by the Watson under the written contract, and assessed damages based on a refusal to transmit four of the five cargoes stipulated for. The claimant maintains that damages should be assessed for only three cargoes, on the ground that the Watson performed one voyage. It is admitted that the Watson did perform a voyage, sailing from Lambert's Point for Providence at the same

date as the Sheldon,—that is, August 2d,—delivering the coal to the same consignee, and receiving payment therefor at the same rate, 80 cents per ton. There is nothing in what was done in connection with this voyage to enable the court to distinguish it from a voyage under the written charter. The case, however, is made positive in favor of the claimant by a letter from the charterer to the Providence Gas Company of July 20, 1899. This was written while the barges were about loading at Lambert's Point. It was as follows:

"Virginia Iron, Coal and Coke Company, General Offices, Bristol, Va.—Tenn.

"104 Water St., Boston, Mass., July 31, 1899.

"A. B. Slater, Esq., Providence Gas Company, Providence, R. I.  Dear Sir: We beg to advise you that we will load this week barges Watson & Sheldon to apply on your orders. One cargo to be applied on the 5,000-ton contract, and one on order previously given for 1,400 tons at $2.30, delivered. You need have no fear about demurrage in case the barges report at the same time.' They are owned by the one company, and, according to the terms of charter, must take their turn to discharge.

"Very truly yours,              Virginia Iron, Coal and Coke Co.,
                                              "Henry T. Allchin, Agt."

The last two sentences of this letter are a substantial admission that, whatever may have been the prior negotiations, the cargoes then loaded on both the Watson and the Sheldon, and which were the cargoes already referred to, were loaded in pursuance of one charter. Therefore, although, as found by the learned judge who tried these cases in the district court, it is quite clearly proved that an oral charter of the Watson was attempted on July 18th, this may have been merged in the written charter on which the libels now before us were brought. The contract between Gilchrist and Stanwood, to which we have referred, was dated on July 24th. The record contains two letters from Gilchrist to Stanwood, dated, respectively, July 17th and July 19th. These refer to Stanwood's taking charge of the barges Bacon and Georger, and of no others. There is nothing to show that he had any authority on July 18th to charter the barge Watson. It rests on the libelant to prove this, and not on the claimant to disprove it. Therefore, the libelant having failed to prove that Stanwood had any authority on July 18th to charter the Watson, its case would necessarily fail so far as that alleged charter is concerned; and it is possible that, after the contract between Gilchrist and Stanwood of July 24th, Stanwood prevailed on the charterer to abandon the oral charter, and to substitute in lieu thereof the charter of July 28th, which he was authorized to make.

It appears that the Watson delivered on the voyage in question 907 tons. In determining the damages which the district court assessed, it included an allowance of 95 cents per ton for the increased freight which the libelant was compelled to pay, computed on 4,024 tons. The decree of the district court (113 Fed. 779) must be so far modified as to make this computation on 3,117 tons, instead of on 4,024.

The claimant also maintains that, after he had been in default on his contract, Stanwood made an arrangement with the charterer by

which two other barges should be substituted for the Watson and the Sheldon; that those barges reported at Lambert's Point; that, not having been laden within a reasonable time, they withdrew, and that they had a right so to do. If the contention of the claimant were correct in this particular, it would be necessary to hold that the charter was satisfied for all substantial purposes, or that the damages were of a comparatively small amount.

The substance of this arrangement is found in the testimony of Mr. Friend, who was the representative of the charterer. He fixes its time as early in September. He says that he urged on Stanwood the necessity of putting in some barges to carry out the contract; that Stanwood said he would report the first barges he could get; that he told Stanwood that he would not hold him to the barges named in the charter if he would only bring the coal forward; and that he kept urging him every few days, until Stanwood finally named two barges which he would have report. Apparently, from Mr. Friend's testimony, this was in season to have had the coal delivered in Providence within the time named in the charter; that is, the 1st of October, if the barges had reported promptly. The barges named were the Georger and the Marion W. Page.

Evidently there was no new contract made between the parties, but simply an expressed urgency on the part of Friend that the original contract should be fulfilled. Therefore, whatever was done or to be done with reference to the substitution of the barges, was merely an urgent request and a permission on the part of the charterer that their owner should substantially perform his contract. Of course, under those circumstances, the terms of the charter would apply to the substituted barges only so far as the then circumstances would call therefor. With reference to this substitution, the pith of the resulting position is that, Gilchrist being in fault, it was his duty to use reasonable efforts to make his contract substantially good, and that the charterer consented that he might do so, and waived holding him to a literal compliance.

The Georger reported at Lambert's Point on September 18th. A schooner, whose capacity was in excess of 2,000 tons, reported the previous day. In accordance with the terms of the charter, the Georger could not claim to be loaded in advance of her turn. Apparently the steamer Cynthia, which took some 400 or 500 tons of coal, was put in ahead of the barge, although she reported later. In accordance with our opinion in Cargo of 2,383 Tons of Soft Coal, passed down on September 4, 1902, reported under title of Donnell v. Manufacturing Co., 118 Fed. 10, this could not have been done ordinarily. Nevertheless, under the special circumstances, which placed on the owner of the Georger the duty of using reasonable efforts to make good his unexcused default, this did not end the case, so far as that barge was concerned. The charter would have given her demurrage in case it had been determined finally that the charterer was in default so far as she was concerned; and also it gave her the privilege of loading "other coal, and returning the next trip" to load thereunder. Therefore, unless the delay was very unreasonable or clearly willful, as her owner had ample compensation se-

cured, he was not relieved from his duty to make good his previous default.

Nevertheless, on October 3d, Stanwood gave the charterer a peremptory notice that he had decided to take this barge and load her elsewhere, and he did so, and she never returned. The testimony of Wilmer, who, as the agent of the charterer, controlled the loading at Lambert's Point, is uncontradicted that on October 3d there were 600 tons of coal ready to load aboard the Georger, and that on the two following days sufficient additional coal arrived to complete her cargo. Whatever may have previously occurred, and whatever may be the facts with reference to an alleged unjustifiable detention of the Georger at Lambert's Point,—matters which we do not find it necessary to determine,—it was the reasonable duty of her owner, on being advised on October 3d that the charterer was ready to load her, to cause her to remain and receive her cargo, and thus to contribute towards making good his previous default.

With reference to the Page, there are not any circumstances shown by the record favorable to Gilchrist. She did not report until September 26th, although the arrangement for her substitution was made early in September. Thus Gilchrist was again in default; not, to be sure, by refusal, but by an unreasonable delay. Wilmer testified that on October 10th he notified her captain that he had coal on hand for her. He also testified that on that day he telegraphed Stanwood that the coal was ready for her, but that another party claimed the barge. Thereupon Stanwood loaded with the coal of the other party. This testimony is supplemented by the correspondence between Stanwood and the representative of the charterer, as follows: On October 9th, apparently in view of the delay subsequent to the new arrangement early in September, that representative wrote Stanwood, urging further modification, which would enable Stanwood to substantially carry out the contract. This was not answered by Stanwood until by his letter of October 13th, in which he observed that the original contract expired October 1st, and added, "Any business done from now will have to be done on a new deal." It cannot be questioned that the Page abandoned the charterer's coal on October 10th in pursuance of the position thus taken by Mr. Stanwood, and, for the same reasons which we have stated with reference to the Georger, it follows that, so far as the Page is concerned, there was again no proper exertion on the part of Gilchrist to make good his previous default. Therefore, looking at the relations of the parties in the early part of September, and at the facts that Gilchrist was then in default without excuse, and that it was his duty to use reasonable efforts to make good that default, we entirely agree that the learned judge in the district court was right in holding that there was nothing with relation to either the Georger or the Page to relieve him from his liability for his original tort.

Apparently freights rapidly advanced after the dates which we have named, and, as the charterer did not get its coal forwarded until early in November, it cost considerably more to do so than it would have cost early in October. The district court allowed the enhanced

cost, and the claimant complains thereof, because he says that it might have been saved by chartering vessels at the earlier date. It is to be noted, however, that the first apparent repudiation of the contract was Stanwood's letter of October 13th, to which we have already referred. On receipt of that letter the charterer appealed to Mr. Gilchrist, as it had a right to do. Gilchrist replied by the letter of October 23d, which we have already cited. In that letter, instead of insisting that the contract was determined, he referred the charterer back to Stanwood. This held the matter in suspense so far as Gilchrist was concerned, and it so remained until October 26th, when he wrote again, ending the relations between the parties. New charters were obtained immediately afterwards; so that the position of the district court that, as until then negotiations were pending, the charterer was justified in delaying accordingly, cannot justly be gainsaid.

A question was made by the claimant with reference to certain demurrage paid to one or more of the vessels which brought forward the coal, and which was included by the district court in its assessment of damages; but this has not been brought to our attention in such way that we are required to give it consideration, or as to enable us to dispose of it properly if we did.

Two questions peculiar to the admiralty remain to be considered, as to which we are clear that the learned judge of the district court was right in all particulars. In the proceedings concerning the Watson the libel was in rem against the vessel, joining also a claim in personam against the owner. The district judge dismissed the libel so far as the vessel was concerned, and retained it against the owner, compensating the vessel by a special allowance of costs. It is claimed that this was a misjoinder. It is not necessary for us to determine whether it was or not. The district court left the matter in practically the same form as though, on an exception being filed, the libelant had stricken out the claim against the vessel. In this particular the case is strictly in accordance with the result which was sustained in Newell v. Norton, 3 Wall. 257, 18 L. Ed. 271. In that case the libel was improperly filed against the vessel, master, owners, and pilot. On exceptions being taken, the libelant discontinued against the owners and the pilot, and a decree was entered against the vessel and master. On an appeal to the supreme court the decree was sustained, the only point being as to the effect of the original joinder of the owners and pilot. In the present case the record before us is in precisely the same form as though there had been a discontinuance in the district court against the barge, and a decree as in Newell v. Norton. When the final condition of the record is in accordance with the substantial rules of the law, neither admiralty nor equity looks at the intervening steps. This is clearly within the principles touching admiralty proceedings stated by us in American Steel Barge Co. v. Chesapeake & O. Coal Agency Co., 115 Fed. 669, 675, 676.

In this connection we have not deemed it necessary to determine whether the rules of admiralty as to joinder are so stringent as stated by Mr. Justice Story in several cases decided by him, because, in

view of what is said on this topic in Conklin's U. S. Admiralty Practice (2d Ed.) 37, and sequence, and in The Corsair, 145 U. S. 335, 342, 12 Sup. Ct. 949, 36 L. Ed. 727, where Newell v. Norton is restated, and especially in view of the subsequent rules of the supreme court permitting joinders, which Mr. Justice Story seemed to think were contrary to fundamental principles, we imagine that his position in this particular would not now be upheld in all respects. The question, however, so far as this case is concerned, is clearly disposed of by the circumstances which we have stated.

The libelant, however, claims that he had a lien on the Watson, and that for that reason the libel as against her should not have been dismissed. Also, in the proceeding against the Sheldon, which formed the basis of one of the appeals before us, the owner was not joined, so that the district court dismissed the libel absolutely; and against this the libelant appealed, claiming that it had a lien on that barge for the breach of the charter.

It is to be observed, first of all, that no complaint is made with regard to the cargoes which were laden aboard the barges. They were properly delivered. The only claim is for the breach of a contract, which, so far as the remaining three cargoes were concerned, was purely executory. It has now become a settled practice, where several vessels make up a line, for the managers to make contracts that goods shall go forward by one or any other of the vessels of the line, depending on the times of arrival and other contingencies. It seems an extraordinary position, heretofore unheard of, that all the vessels of such a line can be held in solido for the breach of such contracts so far as executory, even if parts of the cargoes contracted for had been sent forward. Yet this is necessarily the fundamental principle underlying the position of the libelant in the cases before us. To permit liens to be sustained as claimed by it in solido against sundry vessels, would be to go entirely beyond the purpose of the admiralty law in granting them.

The several vessels of a supposed line, and in this particular case, by analogy, the barges, so far as voyages not completed are concerned, are in no fault. The latter never entered into any contract, either expressly or by implication; but they well and truly performed such voyages as their owner directed them to perform. They should not be held liable for breaches of duty of merely their owners.

The rule of admiralty, as always stated, is that the cargo is bound to the ship and the ship to the cargo. Whatever cases may have been decided otherwise disregarded the universal fact that no lien arises in admiralty except in connection with some visible occurrence relating to the vessel or cargo or to a person injured. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact. It is in harmony with this rule that no lien lies in behalf of a vessel against her cargo for dead freight, or against a vessel for supplies contracted for, but not actually put aboard. The Kiersage, 2 Curt. 421, Fed. Cas. No. 7,762; Pars. Ship. & Adm. (1869) 142, 143. It follows out the same principle that Mr. Justice Curtis states in The Kiersage,

2 Curt. 424, Fed. Cas. No. 7,762, that admiralty liens are stricti juris, and that they cannot be extended argumentatively, or by analogy or inference. He says, "They must be given by the law itself, and the case must be found described in the law."

One of the latest works on admiralty published in the United States, Henry's Admiralty Jurisdiction and Procedure, 180, without hesitation gives the rule as said by us. It has been stated in the opinions of the supreme court in a positive way by Mr. Justice Curtis in The Freeman, 18 How. 182, 188, 15 L. Ed. 341; by Mr. Justice Grier in The Yankee Blade, 19 How. 82, 90, 15 L. Ed. 554; by Mr. Justice Davis in The Lady Franklin, 8 Wall. 325, 329, 19 L. Ed. 455; and by Mr. Justice Davis again in The Keokuk, 9 Wall. 517, 519, 19 L. Ed. 744. It is claimed by the libelant that all the expressions in the cases cited are mere dicta. It is possible that all four might have been decided without any reference to the rule which we have stated. It is certainly true that The Freeman and The Keokuk might have been rested on the same ground as Refining Co. v. Maddock, 36 C. C. A. 42, 93 Fed. 980, 982. Both were cases where bills of lading were given for cargo never received by the vessel, and, of course, they could have been rested on the mere proposition that it is settled law that the master of a vessel has no authority to give a bill of lading for cargo which he has not received, and that that is known to the commercial public, so that all parties dealing with bills of lading, even though innocent, take them subject to that known limitation. Nevertheless, the opinions cited did not see fit thus to rest the cases, but put them on the broader rule which we have stated.

In conclusion, we may add that expressions may be found in opinions, which, although not necessary to the results reached, must be accepted as statements of learned judges of the settled rules of law. Some of the particular expressions referred to are positive; and, independently of our own knowledge of the rules of law, and the reasoning which leads up to them, we would not be justified in rejecting such unqualified statements as we find from such eminent and experienced admiralty lawyers as Mr. Justice Curtis, Mr. Justice Grier, and Mr. Justice Davis.

Following our general rules with reference to the weight to be given to decisions of the circuit courts of appeals in other circuits, we might have reached the same conclusion by accepting that of the circuit court of appeals for the Ninth circuit in The Eugene, 31 C. C. A. 345, 87 Fed. 1001, the circumstances of which are more fully reported under the same title in (D. C.) 83 Fed. 222.

It is true that in the various cases cited no reference is made to the fact, if it ever existed, that there was a single contract for several voyages, and that one or more of the vessels proceeded against had in fact performed one or more voyages contracted for. However, the rules of law which we have stated demonstrate that this distinction is unsubstantial. It is enough, as to that, to restate what we have already said,—that to permit liens such as are now claimed would go beyond the necessities of the admiralty law, would extend liens in violation of the principles stated by Mr. Justice Curtis in The

Kiersage, and would assess damages against a vessel not a party to a contract for a particular voyage either directly or by partial execution of that voyage. As to. the latter proposition, we may well add that while, so far as the charterer and the owner of the barges were concerned, the charter was continuous, yet the vessels, being inanimate, could not, by the very nature of things, enter into a strictly executory contract. Each of them could be subjected to such duties only as might arise by implication of law from the circumstances of a voyage, or other concrete act, on which it had in fact entered; and therefore, as to them, each of the several voyages was logically independent and single.

Several of the questions covered by this opinion are discussed in a very careful and interesting manner by Judge Addison Brown in The Monte A (D. C.) 12 Fed. 331, and his opinion in that case will well repay examination.

In No. 431 and No. 432, appeals relating to the barge S. L. Watson, the judgment is that the decree of the district court is modified in accordance with the opinion passed down this day, and the case is remanded to that court, with directions to proceed in accordance with that opinion; and the costs of appeal are awarded to the claimant.

In No. 433, relating to the barge Thomas P. Sheldon, the decree of the district court is affirmed, and the costs of appeal are awarded to the claimant.