## PETERSBURG, N. N. & N. STEAMBOAT LINE v. NORFOLK–VIRGINIA PEANUT CO.

(Circuit Court of Appeals, Fourth Circuit.   June 9, 1909.)

No. 853.

SHIPPING (§ 105*)—CARRIAGE OF GOODS—LOSS OR INJURY—LIEN.

The claimant owned the steamer Pokanoket, which it operated between Petersburg and Norfolk, Va. Claimant's agent at Petersburg solicited cargo and signed bills of lading; the master being a pilot, charged only with the navigation of the vessel. The agent received from libelant, at claimant's wharf in Petersburg, 275 bags of peanuts for carriage to Norfolk on the steamer, and issued a bill of lading therefor. Owing to a freshet, causing an obstruction in the river, the steamer could not reach the wharf, and the agent employed a lighter, which came into collision with an obstruction, and a part of the peanuts were lost and damaged before the lighter reached the steamer. *Held*, that the reception of the goods at the wharf was a delivery to the vessel, and that she was liable in rem for any loss recoverable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 411; Dec. Dig. § 105.*]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

For opinion below, see 161 Fed. 383.

Henry Bowden (Thorp & Bowden, on the brief), for appellant.

Thomas H. Willcox and B. H. Marks, for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. The facts in this case, which are not disputed, are thus stated in the opinion of the court below:

"The Petersburg, Newport News & Norfolk Steamboat Company were the owners and operators of the respondents' steamer, the Pokanoket, engaged in the carriage of passengers and freight upon the waters of the Appomatox and James rivers between Petersburg and Norfolk, and, having duly solicited, through George B. Townsend, general freight and passenger agent of said company and of said steamer, for the freight in question, on the 5th day of September, 1906, the 275 bags of peanuts were delivered at the wharf of said company and of said steamer in Petersburg, for shipment to Norfolk on the Pokanoket, and the bill of lading was issued therefor. On the evening of the delivery of the peanuts the steamer Pokanoket could not reach the harbor of Petersburg by reason of a freshet, which caused a sand bar to form some quarter of a mile below the city. Whereupon a lighter was engaged by the steamboat company to place the steamer's freight, including the 275 bags of peanuts, on the Pokanoket, and the general manager of the company and others of its employés were engaged in the navigation of the lighter, when it collided with an obstruction in the river, causing it to partially sink, damaging the peanuts, to recover for which this suit was instituted; the peanuts being injured to such an extent that most of them were not placed on board the Pokanoket."

A decree for the libelant in the sum of $1,295.76 was entered. No question is made by the appeal as to the amount of the loss, and it is not denied that the steamboat company is liable for the damage suffered.

and, while there are numerous assignments of error, the point involved in the argument before us is thus stated on page 3 of appellants' brief:

"Is there any maritime lien on the steamer Pokanoket, under the facts in this case, where the damage, if any, was suffered by peanuts which had never been delivered to the steamer by being placed on board, or in the custody and control of the master and crew, and without any bill of lading having been issued by the steamer therefor? Should not this proceeding have been in personam against the company, instead of in rem against the steamer? This is practically the only question involved."

The bill of lading is signed by the agent of the steamboat line, and it appears from the testimony that the master of the Pokanoket was by occupation a pilot, that his duties were confined to the navigation of the boat, that he never issued any bills of lading, and that all of that business was attended to by the agents at Petersburg. The general law as to what constitutes the delivery to the vessel is thus stated in 1 Parsons on Shipping and Admiralty, p. 183:

"The reception of the goods by the master on board of the ship, or at a wharf or quay near the ship, for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, or seeming to have this authority by the action or assent of the owners or master, binds the ship for the safe carriage and delivery of the goods."

The leading case in this country on the point involved in this controversy is The Edwin v. Naumkeag Steam Cotton Company, 1 Cliff. 322, Fed. Cas. No. 4,301, decided by Clifford, Circuit Justice, affirming the decree of Sprague, District Judge, affirmed by the Supreme Court sub nom. Bulkley v. Cotton Company, 24 How. 386, 16 L. Ed. 599. In that case the master of the bark Edwin, then lying at Mobile, agreed through a ship broker to transport for the libelant 707 bales of cotton to Boston. A part of the cargo was loaded on the vessel in the city; but, as she drew too much water to pass the bar fully loaded, she went down the harbor and crossed the bar, where the residue of the cargo was taken to her in lighters. The broker through whom the freight was engaged employed a steam lighter for that purpose, and the steamer Streck was loaded with 100 bales of cotton. After she had arrived at the side of the Edwin, and before any part of the 100 bales was taken out, her boiler exploded, by which all the cotton was thrown into the water. Fourteen bales were picked up by the crew of the Edwin, a few bales were lost, and some were picked up by other parties in damaged condition, and were surveyed and sold. The master signed the bills of lading, including said 100 bales, being advised that he was bound to do so, and that if he refused his vessel would be arrested and detained. On its arrival in Boston the master delivered 607 bales and tendered 14, which the consignees refused to accept on account of their being damaged. Justice Clifford thus states the case:

"It is insisted by the libelant that the liability of the vessel is commensurate with that of the owners, and that the extent of it in regard to both must be ascertained and measured by the terms of the contract made by the master. On the part of the respondent it is insisted that the ship is not bound to the merchandise or the merchandise to the ship, until it is actually placed on board, and that the liability both of the ship and the owner, notwithstanding the terms of the contract, must be narrowed to the service actually performed by the vessel."

The case is fully considered, and the decree of the District Court in favor of the libelants was affirmed; Justice Clifford saying, in the course of his opinion:

"All the cases agree that so soon as a sufficient delivery of the goods is made to an authorized person for the purpose of transportation, in pursuance of a lawful contract, the vessel is liable. * * * As a general rule, whenever the owners are liable the ship is liable, and to such an extent has the rule been carried in some of the cases that it is said that the liability of the ship, and the responsibility of the owners are convertible terms."

Mr. Justice Nelson delivered the opinion of the Supreme Court, affirming the decree below, and says:

"The delivery of the 100 bales to the lighterman was the delivery to the master, and the transportation by the lighter to the vessel the commencement of the voyage in the execution of the contract, the same, in the judgment of the law, as if the 100 bales had been placed on board of the vessel at the city, instead of the lighter. The lighter was simply a substitute for the bark for this portion of the service. * * * The argument urged against this lien of the shipper seems to go the length of maintaining that in order to uphold it there must be a physical connection between the cargo and the vessel, and that the form of expression in the cases referred to is not to be taken in the connection and with reference to the facts of the particular case, but in a general sense, and is applicable to every case involving the liability of the ship for the safe transportation and delivery of the cargo; but this is obviously too narrow and limited a view of the liability of the vessel. There is no necessary physical connection between the cargo and the ship as a foundation upon which to rest this liability."

The cargo of peanuts in this case was delivered to the owners of the steamboat at the place designated by them for the reception of freight, and the bill of lading was signed by the agent of the owners, in accordance with the custom; for it appears from the testimony that the master of the steamboat never issued bills of lading. The contract of affreightment was for the employment of the steamboat; and the use of the lighter was subsidiary to and in execution of that contract. The shipper fully parted with the possession of his goods when he delivered them at the wharf, and had no longer any control or right of control over them, and the employment of the lighter to transport them from the wharf to the steamboat in no sense emanated from the shipper. The president of the Norfolk-Virginia Peanut Company testifies that:

"Either on the 5th, 6th, or 7th of September the captain, or some one down at the boat line, phoned me that they had 275 bags of Spanish peanuts, * * * and they sent the freight bill for 275 bags, which I paid."

Only 138 bags were accepted. On November 9th the general freight agent of the line acknowledged the receipt of the claim for shortage, and said that it would probably be paid before or about the 12th of that month.

In The Oregon, Fed. Cas. No. 10,553, the steamship was engaged in carrying passengers and freight between Portland and San Francisco. On her arrival at Portland, being unable to get up the river on account of the ice, the resident agent of the steamship employed a river steamboat, the Cascades, to transport passengers and freight to the steamship. The libelant shipped aboard the Cascades certain packages of merchandise, taking a receipt from the purser of the river boat. No receipt was given by the Oregon to the agent of the libelant, but one

receipt was given to the Cascades for the whole number of packages, according to the freight list of the latter. One of the packages was lost, and for the claimant it was insisted that it was lost before it came to the Oregon. The court held the Oregon responsible, saying that:

"The receipt of the goods by the Cascades was the receipt of them by the vessel, so as to bind her for their safe carriage and timely delivery. Mc-Cracken was the agent of the owners, and, having chartered the Cascades as a lighter to take the freight to and from the Oregon, that in legal effect that was the same as the master's sending his boat for the goods. In that respect the owner, represented by McCracken, had as much authority in the premises as the master."

—citing Conklin on Admiralty, 151:

"The manner of taking the goods on board and the commencement of the master's duty in this respect depend on the custom of the particular place. More or less is done by the wharfingers or lightermen, according to the usage. If the master receive the goods at the quay or beach, or send his boat for them, his responsibility commences with the receipt."

In Insurance Company v. North German Lloyd (D. C.) 106 Fed. 973, a lighter was sent by the steamship company to the elevator to bring the corn across the harbor to the steamship, where she was lying at her dock. On the way one of the lighters was upset, and her load was lost. The answer of the steamship company averred that it employed lighters owned by others to convey grain from elevators to its ships when it was not convenient to load directly into the ship itself, and that it had agreed to transport the corn from Baltimore to Bremen; that the corn was not received on board the steamship, but was lost by the upsetting of the lighter, through no default or negligence of the steamship or its agents or servants. Judge Morris held the company liable, saying:

"Since the case of Bulkley v. Cotton Company, 24 How. 386, 16 L. Ed. 599, it has been conceded under circumstances such as are presented in this case—that is to say, where the contract is to carry goods from one port to another, and they cannot be loaded immediately on the vessel which is preparing for the voyage, and lighters are sent by the vessel to bring the goods from the warehouse to the ship—that for the purpose of that service the lighter is the substitute of the ship, and that the goods are in fact therefore delivered into the custody and care of the ship and her owners from the time that they are placed on the lighter, and for the purpose of this case I shall take it that the bill of lading, which was intended to be the contract for the carriage, was applicable to these goods, and determined the rights of the parties from the time that the corn was put upon the lighter."

It would serve no good purpose to multiply authorities on this point, for nothing is better settled than that if a ship enters upon the performance of its work, or any step has been taken towards such performance, the ship becomes pledged to the complete execution of the contract, and may be proceeded against in rem for a nonperformance. In the very elaborate brief submitted by the appellant there are a number of citations which may appear to establish a different rule; but examination of the cases cited will show that they relate to contracts of affreightment purely executory, or are mere dicta, not decisions upon cases calling for such. The first case cited is Vandewater v. Mills, 19 How. 82, 15 L. Ed. 554, where the citation is:

"If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the nondelivery in good order of goods never received on board."

That was a libel against the steamship Yankee Blade for the violation of an agreement. There was no contract of affreightment involved, the master or owners had not covenanted to convey any merchandise for the libelant, nor had he agreed to furnish them any, and, as the court says, on page 92 of 19 How. (15 L. Ed. 554):

"This is nothing more than an agreement for a special and limited partnership in the business of transporting freight and passengers between New York and San Francisco. * * * It is not one of those to which the peculiar principles or remedies given by the maritime law have any special application."

The next case cited is The Lady Franklin, 8 Wall. 325, 19 L. Ed. 455. In that case the bill of lading was given by mistake by one who was the agent of several vessels, all alike engaged in transporting goods, but not connected by any joint undertaking to be responsible for one another's breaches of contract. The bill of lading, through a mistake of the agent, acknowledged that certain goods had been shipped by the Lady Franklin, when in fact the goods had been shipped on another vessel, and the only question was whether the bill of lading could be explained by oral testimony, and the court held that, being a receipt as well as a contract, it may in that regard be so explained, especially when it was used as the foundation of a suit between the original parties; the case not being embarrassed by any question of a bona fide purchase on the strength of the bill of lading.

The next case cited is The Keokuk, 9 Wall. 519, 19 L. Ed. 744. There one Robson, a shipper at Winona, took a barge belonging to the packet company, the owners of the steamer Keokuk, without asking permission of the master of the Keokuk, or informing him or any other person of his intention to load her, took her to the elevator near by with his own men, and loaded her with wheat to be shipped to La Crosse. The Keokuk arrived at Winona after dark of a stormy night. Robson's bookkeeper went to the second clerk of the Keokuk, in the dark, in the storm, and handed him two papers, saying, "Here are the bills of that barge." There was no explanation of what the bills were. The clerk did not sign for them, and no receipts were asked. The barge was not watched by Robson, and in the morning it was found sunk at the dock, where he had left it. The court says:

"Neither the master nor any person on the steamer or in the employment of the company had notice that he had taken the barge and loaded it with grain, or that he contemplated doing so. If it be conceded the course of business between the two parties justified him in taking possession of the barge and loading it without the direct permission of the master, yet it falls far short of showing that the barge, when loaded, was considered in the custody of the steamer, without notice to any of her officers. * * * The case of Bulkley v. Naumkeag Cotton Company is cited in opposition to the views here presented, but it is not applicable. There the goods were delivered to a lighter in the control of the ship. Here the shipper took control of the barge and did not deliver either barge or cargo to the steamer."

The Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341, is the next case cited. In that case one Holmes, who had a special

ownership in the schooner, had induced the master to sign the bills of lading, by fraud and imposition, for flour which was not shipped; the pretended flour being consigned to the libelants as factors of Holmes & Co. The main question in the case was whether or not the general owner was estopped from proving that no property was shipped. It was held that he was not estopped, although the special owner, who was the perpetrator of the fraud, would be estopped in favor of the bona fide holder of the bill of lading.

The next case cited, Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998, was also a case of fraud. A bill of lading in the usual form, signed by the general agents of the steamboat, for 150 bales of cotton at Memphis, was delivered to Dickinson & Co., who attached it to a sight draft on plaintiffs in New York, which draft was duly accepted and paid. No cotton was shipped on the steamboat, or delivered at its wharf or to its agents. The question in the case was as to the legal character and effect of the bill of lading in reference to its negotiable quality, and upon the facts it was held that Cobb & Co. were the agents of the steamboat company, with power to solicit freight and to execute bills of lading for freight shipped; that they had no authority to sell bills of lading, or to execute those instruments and go out and sell them to purchasers; and that no man had a right to buy such a bill of lading of them who had not delivered them the goods to be shipped.

The Scott v. The Ira Chaffee (D. C.) 2 Fed. 401, is also relied on by appellants. That was a libel against the Chaffee for breach of contract in the carriage of a boiler. The boiler was never put on board the tug, nor delivered to her master as master, although he received it on behalf of the schooner Louisa, on which it was laden. The Louisa was caught in the ice and detained, and the libel was for damages for detention, which was dismissed. The learned counsel for appellants says this case "squarely decides the principle of law involved." So it does, but the principle of law involved in that case has no relation whatever to this. The citation in appellants' argument is taken from the rubric, and is:

"The owner of the cargo has no lien upon the vessel for the breach of the contract of affreightment until the cargo, or some portion, has been laden on board, or delivered to the master."

The following extract from the opinion more fully states the view of the learned judge:

"There is an abundance of dicta to the effect that the obligation of the cargo to the ship and of the ship to the cargo does not arise until the cargo, or some portion of it, has been laden on board, or at least legally delivered to the vessel; but no case directly in point has yet been decided by the court of last resort. Whatever be the rule with regard to contracts of affreightment which are purely executory, it must now be considered as settled that if a ship enters upon the performance of its work, or any step has been taken towards such performance, the ship becomes pledged to the complete execution of the contract, and may be proceeded against in rem for a nonperformance."

The case before us might well rest upon this statement of the law, for the receipt of the goods by the owners of the boat at the wharf where freight was ordinarily delivered, the issue of a bill of lading therefor, the loading of the goods upon the lighter, under the control

of the owners of the boat, and the moving of the same towards the boat, were each and all steps taken in the performance of a contract of affreightment.

The Caroline Miller (D. C.) 53 Fed. 136, is also cited as a case "exactly in point." This was a libel to recover the value of 11 bales of cotton, an undelivered part of 200 bales, alleged to have been shipped on board the steamship Caroline Miller by Coles, Simpkins & Co. The Caroline Miller had previously been chartered by the claimant to Coles, Simpkins & Co., and was run by the latter as a part of the New York & Brunswick Steamship Line from Brunswick to New York. Judge Brown said in his opinion:

"The evidence leaves no doubt that she delivered to the connecting steamship in New York all the bales that were laden on board of her, and all that were delivered to her master at Brunswick. It also showed that the master had nothing to do with the loading of the steamer, or with the appointment of the stevedore. The bill of lading was not signed by the master, but by the agent of the New York & Brunswick Line, and it is not recited or stated that the cotton had been received on board. It was in part as follows: 'Received on dock in apparent good order and condition by the New York & Brunswick Steamship Line, from Coles, Simpkins & Co., to be transported by the New York & Brunswick S. S. Line steamer called the Caroline Miller, now lying in the port of Brunswick, 200 bales of cotton, etc., to be conveyed in and upon said steamship, or in and upon any other steamship of the line.'"

It appeared that there were other steamers of the line lying at the dock where the Miller lay, and that various lots of cotton were from time to time brought down and placed upon the dock. Judge Brown held that this so-called bill of lading was not properly a bill of lading at all, but only an executory contract to ship in futuro; that the agent of the New York & Brunswick Steamship Line was not the agent of the shipowner, nor of the master, and that the delivery of the goods to that agent was therefore neither a delivery to the master nor a delivery to the ship; in fact, that the delivery of the cotton at the dock worked no change in its legal possession, because the cotton belonged to Coles, Simpkins & Co., who were themselves the charterers, and the agent who signed the so-called bill of lading was their own agent, and the cotton, until it was laden on board, remained as completely under the shippers' control as before. It further appeared in that case that the Caroline Miller had probably left the port before the so-called bill of lading was signed.

The Vigilancia (D. C.) 58 Fed. 698, is another case cited in behalf of appellants. That was a libel in rem for the value of supplies furnished. It appears that the laws of New York prohibited the sale of oleomargarine. The libelants, doing business at Jersey City, N. J., undertook to supply oleomargarine for the steamers which lay at Roberts' Stores, Brooklyn, within the port of New York, their home port. They hired truckmen for the purpose of transporting the goods from New Jersey to Brooklyn. The sole question in the case was whether there was a maritime lien. There could be no maritime lien for supplies in the home port, and it was held that the place where the ships lay was the test of the place of supply, and that the supply was not complete until the delivery to the ships where they lay, and, as this was in their home port, no maritime lien was created thereby.

A number of other cases are cited in the argument for the appellant, all of which have received our careful attention; but it would be unprofitable to state the result of our analysis of them. They are decisions of the lower federal courts, and, while some of them contain general expressions which seem to support the contention of the appellant, those expressions must be taken in connection with the facts in which they are used, and in none of them are the facts analogous to those in the case now under consideration. Even if they were, such dicta would not be binding upon us, and the case is controlled by the principles announced by the Supreme Court in Bulkley v. Cotton Company, 24 How. 386, 16 L. Ed. 599.

The decree of the court below is affirmed.

Affirmed.