RETAIL STORE EMPLOYEES UNION,
LOCAL 400, UFCW, AFL–CIO; and Re-
tail Store Employees Union, Local 692,
UFCW, AFL–CIO

v.

The GREAT ATLANTIC & PACIFIC
TEA COMPANY, INC.

Civ. No. K–79–1714.

United States District Court,
D. Maryland.

Oct. 19, 1979.

Ira M. Lechner, Joseph Semo, David B. Scholl, and Seifman & Lechner, P. C., Washington, D. C., and Donald M. Tannenbaum, Clinton, Md., for plaintiffs.

Jerome Powell, John Stephen Caflisch, Paul L. Landry and Reed Smith Shaw & McClay, Washington, D. C., and W. Shepherdson Abell, and Furey, Doolan & Abell, Chevy Chase, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Two locals of the Retail Store Employees Union, UFCW, AFL–CIO, Locals 400 and 692 (Unions) asked this Court to order The Great Atlantic & Pacific Tea Company, Inc. (Company) to submit certain claims to arbitration. Jurisdiction exists pursuant to section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, since the Company's activities affect interstate commerce.

Originally, the Unions asked this Court to enjoin the Company from opening certain stores and also to require the Company to arbitrate certain disputes with the Unions pursuant to the arbitration clauses of the two collective bargaining agreements. However, after this suit was commenced, the parties entered into a stipulation that any relief ordered in the Unions' favor would be given retrospective effect. At the same time as that stipulation was entered into, the Unions dropped their quest for any

injunctive relief concerning the opening of the stores but pursued their quest for this Court forthwith to require arbitration.

One of the two collective bargaining agreements involved in this case covers the metropolitan Washington, D.C. area;[1] the other relates to the metropolitan Baltimore, Maryland area.[2] Article 2, section 2.2 of the collective bargaining agreement between the Washington local and the Company provides:

> 2.2 The Employer further agrees that if the Employer should establish a new food store, or stores, within the territories described in Paragraph 2.1, this agreement shall apply to such a new store or stores. In the event the Employer engages in Department or Discount type stores, then the Employer and the Union shall negotiate as to the terms for wages, hours and working conditions for employees working in such stores.

Article 2, sections 2.3 and 2.4 of the collective bargaining agreement between the Baltimore local and the Company provides:

> 2.3 The Employer further agrees that if the Employer should establish a new

store or stores within the jurisdiction of the Union * * *, this Agreement shall apply to such new store or stores. In the event the Employer engages in department or discount type stores, then the Employer and the Union shall negotiate as to the terms for wages and hours for such employees.

> In the event an Employer in the future engages in a department or discount type store, commonly known as a general merchandise store, and an agreement between the Union and the Employer cannot be concluded, then the provisions of Article 20, No Strike-No Lockout, shall not be binding upon the Union and the Employer.

> 2.4 Any and all types of Retail Food Markets of the Employer shall be covered by terms and conditions of this Agreement.

Article 20 in both collective bargaining agreements sets forth grievance and arbitration procedures.[3]

On or about July 7, 1979, the Company closed six of its stores in the Washington

---

1. The contract with Local 400.

2. The contract with Local 692.

3. That article, as it appears in the Local 692 contract, reads as follows in both contracts, except that the title of Article 20 in the contract between Local 400 and the Company is "GRIEVANCES AND ARBITRATION," and the word "arbitrations" in the fourth line of clause 20.1 quoted below is in the singular form in the Local 400 contract:

ARTICLE 20 ARBITRATION AND ADJUSTMENT

20.1 Should a controversy, dispute or disagreement arise during the period of this Agreement *concerning the interpretation of the provisions of this Agreement, except that liability for wage claims shall not be subject to arbitrations unless involving a disputed interpretation of the provisions of the Agreement*, there shall be no cessation or stoppage of work or lockout because of such controversy, dispute, or disagreement, but the difference shall be adjusted in the following manner.

20.2 Upon receipt of notice from either party, the representative of the Employer and the representative of the Union shall, within three (3) days, commence discussion in an attempt to reach a settlement of the controversy.

20.3 If the matter is not amicably settled under 20.2 above, then either party may, on giving five (5) days' notice to the other party, submit the matter to a Board of Arbitration appointed as follows:

(1) One member shall be appointed by the Employer involved, and one member shall be appointed by the Union. They shall, within three (3) days thereafter, mutually select a neutral chairman who shall be disinterested, and not a member of the Union, nor engaged in the same line of business as the Employer, and these three (3) shall constitute a Board of Arbitration and shall render a decision within five (5) days or such further time as the Board of Arbitration may mutually agree upon and said decision shall be final, binding and conclusive upon all parties concerned.

(2) In the event the Board of Arbitration is unable to agree on a mutual chairman within the time limits herein prescribed, a request shall be made to the Federal Mediation and Conciliation Service for a list of fifteen (15) arbitrators and the parties shall select therefrom one (1) Arbitrator as follows: each of the parties shall strike one (1) name from the list until a last name remains, each of the parties drawing lots to determine who shall be entitled to the first strike.

area which operated under the name of A & P and two of its stores in the Baltimore area which operated under that name. The Company announced that new food stores called "Plus Food Stores" would be opened, that those stores would differ somewhat from conventional retail stores, and that while those stores would essentially be retail food stores, they would offer more limited assortments than the stores operated under the name of A & P. The Plus Food Stores were to be opened in the same buildings as had been previously occupied by the closed stores which operated under the name of A & P.

The Unions contend that the Plus Food Stores are A & P stores in everything except name, and that, accordingly, pursuant to the provisions of the respective articles 4.4 of the two collective bargaining agreements, the laid-off workers from the A & P stores should be reinstated as employees in the Plus Food Stores.[4] Alternatively, the Unions argue that even if the Plus Food Stores are not A & P stores, the Plus Food Stores are "new stores" within the meaning of certain provisions of the two collective bargaining agreements.[5]

Plus Food Stores are operated by a wholly owned subsidiary of A & P. The Compa-

(3) The Arbitrator shall not have the authority to decide questions involving the jurisdiction of any Local or of the International or which may in any way affect or change the Union Security Clause, nor shall the Arbitrator have the authority to effect a change in, modify, or amend any of the provisions of this Agreement or to make decisions or provisions covering wages or working conditions to be incorporated either in a new Agreement or any subsequent annual Agreement, except as hereinafter provided.

20.4 The provisions of no strike or lockout shall not be binding on either party if the other fails to abide by the decision of the Board of Arbitration. The expenses of the Arbitrator shall be borne equally by both the Employer and the Union.

20.5 All complaints must be filed, in writing, within thirty (30) days after occurrence of the matter in dispute of disagreement, provided that any complaints in reference to dismissal must be filed, in writing, to the Employer within ten (10) days from the date of dismissal. Complaints not filed within the limits herein specified shall have no right of appeal by any party involved.

20.6 During the consideration of such difference or misunderstanding, neither party shall use any coercive or retaliatory measures to compel the other party to accede to its demands.

20.7 Since it is the desire of the parties to expedite the handling of all grievances, they therefore agree that the time limits prescribed must be followed. The party failing to move forward as required shall be deemed to have withdrawn the grievance. All notices required herein shall be in writing.

20.8 In lieu of paragraph 20.3 of this Article, the Employer and Union agree to establish a panel of arbitrators.

This permanent panel shall be established and in operation not later than March 1, 1978.

The Employer and the Union agrees to expedite all arbitration cases through this panel within a seven (7) day period, unless the need for additional time is required for preparation. In no case will the elapsed time exceed fifteen (15) days, unless agreed to by the Union and the Employer.
[Emphasis added.]

4. Article 4.4 of the collective bargaining agreement between the Company and Local 400 provides as follows with regard to the Washington area:

4.4 In all layoffs the ordinary rules of seniority shall prevail with due consideration being given to the job classification, fitness for the work involved, and the practicability of applying the rules of seniority in the particular case. Employees laid off for periods of less than twelve (12) months shall have preference to reinstatement in the reverse order. The service record of such reinstated employees shall not be interrupted. Sickness does not count as layoff. A full time employee shall have seniority over a part time employee to the extent that a full time employee who is laid off in order of seniority may claim a part time schedule calling for a reduction of hours provided due consideration is given to job classification and to fitness to perform the work involved. Part time employees shall have seniority over other part time employees under the same conditions.

Article 4.4 of the collective bargaining agreement between the Company and Local 692 provides in relevant part as follows with regard to the Baltimore area:

4.4 Full time employees to be laid off shall have the option of part time employment, and shall be placed at the top of the part time seniority list, or may take a complete layoff. They shall have the right of recall on any full time opening, provided they can do the work.

5. The "new stores" clauses are quoted *supra* p. 89.

ny contends that the operations of that subsidiary are separate and distinct from the operations of the A & P stores and that the Plus Food Stores are not A & P stores. As to the "new stores" clauses, the Company contends that they are not applicable because the A & P and Plus Food operations are separate and distinct, but that if those clauses are applicable, the Unions have not demonstrated at this time that the respective locals represent the majority of the employees in those stores.

The arbitration clauses in the two collective bargaining agreements involved in this case are virtually identical. Those clauses provide for arbitration of all controversies, disputes or disagreements arising under the respective contracts except for disputes relating to liability for such wage claims as do not require interpretation of the contracts. The arbitration clauses are broad, as was the clause involved in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 576, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Therein, Mr. Justice Douglas wrote (at 581–83, 80 S.Ct. at 1352):

> Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement.
>
> \*    \*    \*    \*    \*    \*
>
> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

■ In any case in which one party to a collective bargaining agreement seeks an order of a court requiring the other party to such agreement to submit a dispute to arbitration, the court must initially determine whether the parties have respectively bound themselves to arbitrate that dispute. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *cf. Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 256–60, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). If the parties have so bound themselves, then the court must order the parties to arbitrate. *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 249–50, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977); *Amalgamated Clothing & Textile Workers Union v. Ratner Corp.*, 602 F.2d 1363, 1371 (9th Cir. 1979); *Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 119 (4th Cir. 1976). In *Nolde*, Mr. Chief Justice Burger, in the course of concluding that the employer was obligated to arbitrate a claim for severance pay despite the fact that the contract had been terminated, observed (430 U.S. at 250, 97 S.Ct. at 1071):

> Indeed, since the parties contracted to submit "all grievances" to arbitration, our determination that the Union was "making a claim which on its face is governed by the contract" would end the matter had the contract not been terminated prior to the closing of the plant. [Citation omitted.]

In *Lever Brothers*, Judge Hall, after noting the teachings of *Warrior & Gulf* and commenting that "neither the contract in *Warrior & Gulf*, nor the contract in this case expressly excluded a particular grievance from arbitration," concluded that the grievance involved presented "a matter for consideration by the arbitrator. In this case, it cannot be said with positive assurance that the arbitration clause was not susceptible of an interpretation that covered the asserted dispute." 554 F.2d at 119.[6]

■ In the case at bar, the arbitration clauses in the two collective bargaining agreements are hardly susceptible of any

---

6.  *See also International Union of Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491-92, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972); *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Drivers, Chauffeurs, Warehousemen and Helpers Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1342 (4th Cir. 1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979).

interpretation other than that they cover the disputes between the parties concerning which the Unions seek herein an Order of this Court to arbitrate. In *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), the union sought arbitration under a broad arbitration clause of a claim that the employer was improperly allocating work to members of another union. The employer in *Carey* refused to arbitrate, claiming that the controversy "presented a representation matter for the National Labor Relations Board." *Id.* at 262–63, 84 S.Ct. at 404. The case came to the Supreme Court from the Court of Appeals of New York. Writing for six members of the Supreme Court, Mr. Justice Douglas reversed the Court of Appeals of New York and held that the controversy was one which should be submitted to arbitration. In so doing, he wrote (at 263, 84 S.Ct. at 404):

> We have here a so-called "jurisdictional" dispute involving two unions and the employer. But the term "jurisdictional" is not a word of a single meaning. In the setting of the present case this "jurisdictional" dispute could be one of two different, though related, species: either—(1) a controversy as to whether certain work should be performed by workers in one bargaining unit or those in another; or (2) a controversy as to which union should represent the employees doing particular work. If this controversy is considered to be the former, the National Labor Relations Act [citation omitted] does not purport to cover all phases and stages of it.

The Justice also noted (at 265, 84 S.Ct. at 404):

> Grievance arbitration is one method of settling disputes over work assignments * * *. To be sure, only one of the two unions involved in the controversy has moved the state courts to compel arbitration. So unless the other union intervenes, an adjudication of the arbiter might not put an end to the dispute. Yet the arbitration may as a practical matter end the controversy or put into movement forces that will resolve it.

Subsequently, in his opinion in *Carey*, Mr. Justice Douglas examined the possibility that the controversy was not jurisdictional, but might rather be representational and, in so doing, stated (at 268–72, 84 S.Ct. at 407):

> If this is truly a representation case, either IUE or Westinghouse can move to have the certificate clarified. But the existence of a remedy before the Board for an unfair labor practice does not bar individual employees from seeking damages for breach of a collective bargaining agreement in a state court [citation omitted]. We think the same policy considerations are applicable here; and that *a suit * * * as provided by § 301(a) of the Labor Management Relations Act of 1947* [citations omitted] * * * *is proper, even though an alternative remedy before the Board is available*, which, if invoked by the employer, will protect him.
>
> \*       \*       \*       \*       \*       \*
>
> As the Board's decisions indicate, disputes are often difficult to classify. * * * Even if it [this case] is in form a representation problem, in substance it may involve problems of seniority when layoffs occur [citations omitted] or other aspects of work assignment disputes. If that is true, there is work for the arbiter whatever the Board may decide.
>
> If by the time the dispute reaches the Board, arbitration has already taken place, the Board shows deference to the arbitral award, provided the procedure was a fair one and the results were not repugnant to the Act.
>
> \*       \*       \*       \*       \*       \*
>
> Should the Board disagree with the arbiter, * * * the Board's ruling would, of course, take precedence * * *.
>
> *However the dispute be considered —whether one involving work assignment or one concerning representation— we see no barrier to use of the arbitration procedure.* If it is a work assignment dispute, arbitration conveniently fills a gap and avoids the necessity of a strike to bring the matter to the Board. If it is a

representation matter, resort to arbitration may have a pervasive, curative effect even though one union is not a party.

*By allowing the dispute to go to arbitration its fragmentation is avoided to a substantial extent; and those conciliatory measures which Congress deemed vital to "industrial peace"* [citations admitted] *and which may be dispositive of the entire dispute, are encouraged. The superior authority of the Board may be invoked at any time. Meanwhile the therapy of arbitration is brought to bear in a complicated and troubled area.*

(Emphases added; footnotes omitted).

In *Carey*, the controversy involved two different unions as well as the company and not, as in the case at bar, the company and two locals of the same international union.[7] However, that does not present any basis for not applying *Carey* to this case. Indeed, the applicability of *Carey* is supported by the fact that neither party runs any risk of prejudice from this Court's order that the parties arbitrate. At a hearing held on the record in open Court on September 25, 1979, this Court asked the attorney for the Company how the Company could be prejudiced by arbitration. Counsel for the Company stated that prejudice might result from the arbitrations if, after the arbitrations, the Company then proceeded to present to the National Labor Relations Board (NLRB) the possible representation issue because, if that occurred, the arbitrations and the NLRB proceeding would be duplicative. The attorney for the Unions responded by stating that, if the Unions failed to prevail at the arbitrations, the Unions would not proceed to make any claims before the NLRB. Thus, while the arbitrations and the NLRB proceeding might be duplicative if the Unions should win before the arbitrator, the same would not be true if the

Company prevailed at the arbitrations. Further, the fact that the arbitrations and an NLRB proceeding, if the latter should take place, might be duplicative, does not mean that arbitration should not be ordered. *See, e. g., Carey, supra* at 268, 272, 84 S.Ct. 401.

In *Amalgamated Clothing and Textile Workers Union v. Ratner Corp., supra*, in which the question was posed as to whether or not a collective bargaining agreement was binding upon a particular corporation after certain corporate changes, the District Court had ruled that the defendant employer was not obliged to proceed to arbitration. Reversing, the Ninth Circuit stated (602 F.2d at 1369–70):

Neither *John Wiley* nor *Howard Johnson* is on all fours with this case. Ratner Manufacturing did not merge with an independent business entity nor was it purchased by one. It became Ratner Corporation, then transferred its manufacturing operations to a new subsidiary. This case is an even stronger one for imposition of the duty to arbitrate than the two successorship cases.

\* \* \* \* \* \*

Here, Ratner Manufacturing merely changed its name by amending its articles of incorporation and filing the change with the state. Thus Ratner Corporation was the same company as Ratner Manufacturing, albeit with a different function. It could not escape its contract obligations by creating a subsidiary to take over its manufacturing operations. Even though it no longer directly employed the personnel covered by the contract, it remained bound by it as it would be in the event of a sale of its manufacturing plant to another company.

---

7. The virtually identical nature of the collective bargaining agreements and the disputes involved in this case suggest the possibility of one arbitration involving the Company and both locals rather than two arbitrations under the two separate collective bargaining agreements. *Compare Baltimore Typographical Union No. 12 v. The A.S. Abell Co.*, 441 F.Supp. 596 (D.Md.1977), *aff'd without opinion*, 588

F.2d 1347 (1979). However, during oral argument in this case, the Company stated that *without in any way conceding that any arbitration was appropriate*, it desires two separate arbitrations rather than one combined arbitration. The Unions stated that they had no objection to two separate arbitrations, though they indicated that they thought that it might make sense to have one combined arbitration.

There is another reason to hold that Ratner Corporation, and not its subsidiary, is bound by the contract. If the subsidiary only were bound, by the protection bargained for in the "Other Factories" clause would be seriously diluted.

The parent, Ratner Corporation, could subcontract free of the restrictions imposed by the "Other Factories" provision, and of the duty to arbitrate. The "Other Factories" clause would provide substantially less protection as applied to the new subsidiary because, as a result of the reorganization, the other subsidiaries of the parent could do most of the subcontracting. The parent would have escaped the obligations it originally undertook as Ratner Manufacturing by the simple expedient of reorganizing its corporate structure.

*We also believe that "[i]t would derogate from 'the federal policy of settling labor disputes by arbitration'" if this change in the company's corporate structure were to negate the duty to arbitrate which it voluntarily assumed as Ratner Manufacturing. John Wiley, 376 U.S. at 549, 84 S.Ct. 909, quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). [Emphasis supplied.]*

As in this case, the employer in *Ratner Corp.* argued that

by compelling it to arbitrate the subcontracting dispute, we would force its subsidiaries now without contracts with the Union to recognize it as their bargaining agent. This, it contends, would constitute an unfair labor practice because the employees of the subsidiaries have a right to select their own representatives. *Cf. International Ladies' Garment Workers*

*Union v. NLRB*, 366 U.S. 731, 737, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

\* \* \* \* \* \*

The Union does not seek to represent the employees of the Ratner subsidiaries. It seeks only to compel Ratner Corporation to arbitrate under a collective bargaining agreement covering those initially employed by Ratner Manufacturing, as to a clause negotiated for their benefit.

Even if the arbitrator were to find that Ratner Corporation had violated the no-subcontracting provision, this collective bargaining agreement says nothing about requiring the Ratner subsidiaries to accept the Union as their bargaining agent.

It is unlikely that the result of the arbitration will be to force Ratner Corporation to commit an unfair labor practice. If the company still believes that result will follow after the arbitrator's decision is announced, then it may challenge enforcement of the award \* \* \*. The prospect is now too speculative to provide grounds to refuse to compel arbitration. *Id.* at 1371–72.

New stores clauses such as the ones in the collective bargaining agreements before this Court have been the subject of considerable debate.[8] Such clauses are not *per se* invalid.[9] Whether they are applicable or enforceable in a given instance presents issues which are not before this Court at this time. "Courts must avoid reaching the merits of arbitrable disputes \* \* \*." *Drivers, Chauffeurs, Warehousemen and Helpers Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1342 (4th Cir. 1978). Furthermore, requiring arbitration at this time is not, as the Company asserts, a useless exercise. It is possible that the arbiter's determination

---

8. *See, e. g., NLRB v. Retail Clerks Local 588*, 587 F.2d 984 (9th Cir. 1978); *Retail Clerks International Assn. Local 455 v. NLRB*, 166 U.S.App.D.C. 422, 510 F.2d 802 (D.C.Cir.1975); *Westinghouse Electric Corp. v. NLRB*, 506 F.2d 668 (4th Cir. 1974); *Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352 (9th Cir. 1970); *Houston Division of the Kroger Co.*, 219 NLRB 388 (1975); *Smith's Management Corp.*, 197 NLRB 1156 (1972).

9. "[T]here is no need to hold these clauses totally invalid simply because they do not contain an explicit condition that unions must represent a majority of the employees in a new store, inasmuch as the Board will impose such a condition as a matter of law." *Houston Division of The Kroger Co.*, 219 NLRB 388, 389 (1975).

as to whether the Plus Food Stores are in fact A & P stores and, if not, either "new stores" or not "new stores" within the meaning of the collective bargaining agreements, may resolve the dispute. But if the decisions made by the arbiter do not terminate the controversy, they still may, as Mr. Justice Douglas observed in *Carey* (375 U.S. at 272, 84 S.Ct. 401) "have a pervasive, curative effect." The Company's contentions that, in the end, the issues involved are at their core "representational" in nature does not mean, as Mr. Justice Douglas made clear in *Carey*, that the arbitration machinery is to be scrapped.