**E.A.S.T., INC. OF STAMFORD, CON-NECTICUT, Plaintiff–Appellee,**

**v.**

**M/V ALAIA, et al., Defendants,**

**Advance Co., Inc., Claimant–Appellant.**

No. 88–3136.

United States Court of Appeals,
Fifth Circuit.

June 26, 1989.

Rehearing and Rehearing En Banc
Denied July 27, 1989.

Robert B. Deane, Kenneth Servay, New Orleans, La., for claimant-appellant.

Kenneth W. Heard, New York City, Antonio Rodriguez, Mary C. Hubbard, New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, KING and JONES, Circuit Judges.

KING, Circuit Judge:

Claimant-appellant Advance Co. appeals from the district court's order refusing to vacate the arrest of the M/V ALAIA and referring the parties to arbitration of their dispute in London pursuant to the terms of their charter party. We affirm the order of the district court.

## I.

### A. Facts

The underlying facts of this case are essentially undisputed and are set forth fully in the district court opinion. *E.A.S.T. of Stamford v. M/V ALAIA*, 673 F.Supp. 796 (E.D.La.1987).

Briefly, plaintiff-appellee E.A.S.T. ("EAST") agreed in October of 1987 to charter the M/V ALAIA ("ALAIA"), owned by defendant-appellant Advance, Co. ("Advance"). The charter was on a New York Produce Exchange time charter form and provided that the ALAIA would be delivered to EAST at New Orleans for "A timechartertrip via port(s) in/out geographical rotation—always afloat—always within I.W.I. duration about 20/25 days without guarantee." The charter party also stated that EAST's intention was to carry milk carton stock on pallets and soda ash in bulk from New Orleans and Port Arthur to Puerto Cabello, Venezuela. The charter party also contained an arbitration clause and specified that the place of arbitration would be London rather than New York and that the contract would be governed by English law.

EAST simultaneously entered into two voyage subcharters—one to carry milk carton stock and wood pulp on pallets from New Orleans to Puerto Cabello and one to carry bulk soda ash from Port Arthur to Puerto Cabello. EAST paid Advance $26,-700 in advance charter hire. EAST also engaged Navios Ship Agencies, Inc. ("Nav-

ios") to see to the vessel's needs and forwarded $15,000 to Navios to cover port charges, agency fees and other expenses. EAST ordered bunkers for the vessel and through its agent instructed the ALAIA to proceed to New Orleans to load the milk carton stock and wood pulp. EAST also engaged, through its agent, a pilot to bring the vessel up the Mississippi river to the port of New Orleans, tugs to maneuver the ship into its berth, and line handlers to secure the vessel to the dock. EAST's agent also arranged and paid for dockage, permitting the vessel to tie up and lie alongside the wharf.

The ALAIA was delivered under the time charter and went "on hire" at 001 hours on October 20, 1987. Pursuant to the terms of the charter, EAST had engaged a surveyor to inspect the vessel when it arrived in New Orleans. The vessel was also inspected by surveyors for each of the two subcharterers and by a surveyor for Advance. On October 20 and 21, 1987, EAST's surveyor inspected the ALAIA and concluded that it was not suitable to carry the intended cargo. The surveyors for the subcharterers agreed.

EAST's surveyor found that rust, dirt, and debris made the vessel unfit to carry soda ash, that the vessel was not suitable for "grab discharge"—in violation of a specific warranty in the time charter, and that the hatch covers were so severely rusted that the vessel was unseaworthy. As a result of these findings, EAST rejected the ship and filed an *in rem* action, under the Federal Arbitration Act, 9 U.S.C. § 8, and Supplemental Admiralty Rule C, in the Federal District Court for the Eastern District of Louisiana to compel arbitration under the charter party and to obtain security for the arbitration award through the arrest of the vessel.

Two days after the arrest of the vessel, Advance filed a notice of appearance *in personam,* an answer and a counter-claim, and moved to vacate the arrest on the grounds first, that no valid time charter had come into existence and second, that no maritime lien could arise from the breach of the charter party as no cargo had yet

been loaded on the vessel. Advance also argued that the district court could not order the parties to arbitration on the basis of *in rem* jurisdiction.

### B. District Court Decision

After a post-seizure hearing, the district court first rejected the argument that no valid time charter existed. Then, relying primarily on the reasoning of *International Marine Towing v. Southern Leasing Partners, Ltd.,* 722 F.2d 126 (5th Cir.1983), *cert. denied,* 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984), the district court held that a maritime lien could arise from the breach of a *time* charter even when the breach occurs before the cargo has been loaded. Accordingly, the court found that the seizure was proper. Finally, the district court held that *in rem* jurisdiction provided a sufficient basis to refer the parties to arbitration under Section 8 of the Federal Arbitration Act. The district court noted that if there was any defect in its jurisdiction to refer the parties to arbitration, it was cured by the fact that Advance appeared *in personam,* not only to defend the action brought by EAST, but also to pursue a counterclaim against EAST. The district court ordered each of the parties to post security for arbitration, ordered the parties to proceed to arbitration in London, and retained jurisdiction for purposes of enforcing any arbitration award. Advance filed a timely notice of appeal from the order of the district court.

### C. Issues on Appeal

Relying on three separate theories, Advance argues that the district court erred in finding that EAST had a maritime lien against the ALAIA. Advance asserts first that there is no maritime lien for breach of a time charter. Alternatively, Advance argues that a time charter is a contract of affreightment and therefore may not give rise to a lien unless the cargo has been loaded or otherwise placed in the possession or control of the vessel. Third, Advance urges that even if time charters are not ordinarily deemed contracts of affreightment, voyage charters are contracts

of affreightment, and this particular charter, although it appears on a time charter form, is in fact a voyage charter and should be treated as such. Finally, Advance argues that even if the district court had *in rem* jurisdiction, the court erred in holding that *in rem* jurisdiction is a sufficient basis on which to refer parties to arbitration and furthermore, that pre-arbitration attachment is inconsistent with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–08.

For the reasons set forth below, we reject each of these contentions.

### D. Standard of Review

■ In admiralty cases, as in other cases, the district court's findings of fact are subject to the clearly erroneous standard of review under Rule 52(a), while questions of law are subject to de novo review. *Dow Chemical Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1042 (5th Cir. 1987). The questions presented in this case are entirely legal and are therefore reviewed de novo.

## II.

### A. Appealability of the District Court Order

■ As a preliminary matter, we note that although an order upholding a pre-arbitration attachment under 9 U.S.C. § 8 is generally not considered a final judgment appealable under 28 U.S.C. § 1291, Section 1292(b) authorizes appellate review of interlocutory orders where the district court determines that "the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Constructora Subacuatica Diavaz v. M/V Hiryu*, 718 F.2d 690, 692 (5th Cir.1983). Because the

district court in this case amended its original orders to certify them for appeal under Section 1292(b), the order upholding the pre-arbitration arrest of the ALAIA is appealable.[1]

### B. The District Court's Jurisdiction

Before proceeding to the central issue of this case—whether there is a maritime lien arising from the alleged breach of a time charter—we must address another threshold question. Advance asserts on appeal that the pre-arbitration arrest of the ALAIA is inconsistent with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards as implemented by 9 U.S.C. §§ 201–08. Although Advance apparently did not raise this argument below, we will address it because the resolution of this issue could bear on the jurisdiction of the district court to permit prejudgment attachment of the ALAIA.

Advance relies on the Third Circuit's decision in *McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032 (3d Cir.1974). In *McCreary*, the court held that resort to prejudgment attachment under state law was in violation of the parties' agreement to arbitrate their disputes and was therefore precluded by the Convention which "forbids the courts of a contracting state from entertaining a suit which violates an agreement to arbitrate." *Id.* at 1038. The court reasoned that the Convention's language directing a court to "refer parties to arbitration" is stronger than the Act's requirement that a court simply "stay the trial of the action," *id.*, and ousts the district court of all jurisdiction over a dispute subject to arbitration under the Convention. The court reasoned further that the removal provision of the implementing legislation, 9 U.S.C. § 205, was intended "to prevent the vagaries of state law from impeding [the Convention's] full implementation," and concluded that "continued re-

---

**1.** We note that the district court may have relied erroneously on the Federal Arbitration Act, 9 U.S.C. § 8, rather than on its authority under the statutes implementing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 206.

sort to foreign attachement in breach of the agreement is inconsistent with that purpose." *Id.* Because *McCreary* construes the Convention to prohibit prejudgment attachment and to preclude the retention of jurisdiction by the district court pending arbitration, we cannot rely on Advance's failure to raise the question below as a ground to avoid the issue.

■ First, we note that EAST maintains that Advance may not avail itself of any defenses available under the Convention because Advance is a Liberian corporation and Liberia is not a signatory to the convention. EAST asserts that our decision in *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987), supports this proposition. In that case, we held that the Convention did not confer on U.S. courts the power to compel arbitration in non-signatory nations. *Id.* at 331.

EAST apparently concedes, however, that *Ashland Oil* does not hold the Convention inapplicable to arbitration agreements where one party is a citizen of a non-signatory nation. To the contrary, *Ashland Oil* recognizes that the Convention focuses on the situs of the arbitration, not upon the nationality of the parties. The court observed that if NIOC—a citizen of a non-signatory nation—had "chosen to negotiate a forum selection clause with a situs in any one of the 65 nations that are signatories to the Convention," that clause could have been enforced by U.S. courts. *Id.* at 334.

The court further stated that "[w]hen the United States adhered to the Convention, it expressly chose the option available in Article I(3) to 'apply the Convention, on the basis of reciprocity, to the recognition and enforcement of *only* those awards made in the territory of another Contracting State.'" *Id.* at 335 (quoting Declaration of the United States upon Accession,

*reprinted in* 9 U.S.C.A. at 192 n. 43 (Supp. 1988) (emphasis added)). The principle of reciprocity is thus concerned with the forum in which the arbitration will occur and whether that forum state is a signatory to the Convention—not whether both parties to the dispute are nationals of signatory states. *La Societe Nationale pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocarbures v. Shaheen Natural Resources, Inc.*, 585 F.Supp. 57, 64 (S.D.N.Y.1983), *affirmed on basis of district court opinion,* 733 F.2d 260 (2d Cir.), *cert. denied,* 469 U.S. 883, 105 S.Ct. 251, 83 L.Ed.2d 188 (1984); *see also Imperial Ethiopian Government v. Baruch–Foster Corp.*, 535 F.2d 334, 335 (5th Cir. 1976) (confirming arbitration award in favor of Ethiopian Government although Ethiopia is not a signatory to the Convention); Quigly, *Convention on Foreign Arbitral Awards* 58 A.B.A.J. 821, 822 (1972) ("The convention adopts a territorial, rather than national, approach and may turn out to be available in a case involving nationals and residents of nonmember states.").[2]

EAST attempts to draw a distinction between enforcing an award rendered by a panel sitting in a signatory nation and allowing a national of a non-signatory state to benefit from the Convention in the courts of the United States. Although we stated in *Ashland Oil* that "[c]oncerned with reciprocity, Congress must have meant only to allow signatories to partake of the Convention's benefits in U.S. courts," 817 F.2d at 335, this does not mean that we will decline to apply the terms of the Convention to an arbitration clause that *is* governed by Convention and not "unenforceable *ab initio* "—as was the arbitration agreement in *Ashland Oil.*

In the instant case, the arbitration is to be conducted in London. Because Great

---

2. The Third Circuit's decision in *Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro,* 712 F.2d 50 (3d Cir. 1983), is not to the contrary. In that case, the court concluded that where all the parties to the dispute were Italian, and both Italy and the United States were signatories to the Conven-tion, the arbitration clause at issue was governed by the Convention. *Id.* at 52. The court neither considered nor decided whether the arbitration clause would be governed by the Convention if one of the parties to the arbitration agreement was a non-signatory nation and the forum for arbitration was in a signatory nation.

Britain is a signatory to the Convention, we cannot conclude that Advance's Liberian nationality removes the arbitration provision in this charter party from the purview of the Convention.

■ We conclude, however, that the arrest of a vessel prior to arbitration is not inconsistent with the Convention. *McCreary* has been criticized expressly by a number of courts and commentators—particularly in the admiralty context.[3] *Atwood Navigation, Inc. v. M/V Rizal*, No. 89–1221, slip op., 1989 WL 16306, 1989 U.S. Dist.Lexis 1828 (E.D.Pa. February, 24, 1989) (suggesting, without deciding, that *McCreary* is not applicable to pre-arbitration attachment under Section 8 of the Act); *Irinkos Shipping Corp. v. Tosco Corp.*, No. 84–519–Z, slip op., —— F.Supp. —— (D.Mass. April 6, 1984) (available on Lexis) (declining to follow *McCreary* in light of extensive criticism); *Andros Compania Maritima, S.A. v. Andre & CIE, S.A.*, 430 F.Supp. 88, 91 (S.D.N.Y.1977); *Atlas Chartering Services v. World Trade Group*, 453 F.Supp. 861 (S.D.N.Y.1978); *see also Carolina Power & Light Co. v. Uranex*, 451 F.Supp. 1044 (N.D.Ca.1977) (declining to follow *McCreary* in non-admiralty context); *but see ITAD Assoc. v. Podar Bros.*, 636 F.2d 75 (4th Cir.1981) (following *McCreary* in non-admiralty context and releasing prejudgment bond); *Metropolitan World Tanker Corp. v. P.N. Pertambangan Minjakdangas Bumi Nat'l*, 427 F.Supp. 2, 4 (S.D.N.Y.1976) (following *McCreary* in case that was not a "traditional admiralty proceeding" under 9 U.S.C. § 8).

The plaintiff in *McCreary* had sought actively to avoid arbitration, initiating state court proceedings by attaching the defendant's property. Conversely, section 8 of the Federal Arbitration Act has expressly reserved the right of an aggrieved party in an admiralty case to employ traditional admiralty law procedures—including arrest of a vessel under Supplementary Rule C—to obtain security for arbitration. 9

U.S.C. § 8; *Barge Anaconda v. American Sugar Refining Co.*, 322 U.S. 42, 45, 64 S.Ct. 863, 865, 88 L.Ed. 1117 (1974).

The enabling legislation for the Convention provides expressly that the provisions of the Act may apply in actions under the Convention "to the extent [they] [are] not in conflict with" the Convention. *Atlas Chartering*, 453 F.Supp. at 863 (quoting 9 U.S.C. § 208). The Convention does not expressly forbid pre-arbitration attachment and it has been argued persuasively that "Section 8 is no more inimical to the Convention's design—i.e., to encourage submissions of international commercial disputes to arbitral proceedings ...—than it has been to the longstanding policy ... favoring resort to arbitration of disputes, whether or not entirely domestic." *Andros*, 430 F.Supp. at 91 (citations omitted); *see also* T. Schoenbaum, *Admiralty & Maritime Law* 663 (1988) (view that Convention does not preclude pre-arbitration attachment pursuant to section 8 is "manifestly correct.") In fact, attachment may "serve[ ] ... as a security device in aid of arbitration." *Atlas Chartering*, 453 F.Supp. at 863.

In this case, as in *Atlas Chartering*, "the very relief sought in the complaint is to *compel* arbitration." *Id.* We conclude that prejudgment attachment under Section 8—as an aid to arbitration—is manifestly not inconsistent with the aims of the Convention. We therefore reject Advance's argument that pre-arbitration arrest of the ALAIA was precluded by the Convention and proceed now to the merits of the arrest.

## C. Existence of a Maritime Lien

Because we find the district court's opinion on this point to be well-reasoned and persuasive, we write briefly with the aim only of clarifying any ambiguity in the district court's decision.

---

**3.** While *McCreary's* broad language could sweep admiralty cases within the scope of the decision, particularly because Section 8 of the Act also allows prejudgment attachment in admiralty cases pursuant to state law, we need not decide today whether pre-arbitration attachment in a non-admiralty case is proscribed by the Convention.

In arguing that there is no maritime lien in this case to provide the basis for the district court's *in rem* jurisdiction, Advance relies here, as it did below, on the well-established rule that "the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and the cargo shipped under it." *Schooner Freeman v. Buckingham,* 59 U.S. (1 How.) 182, 188, 15 L.Ed. 341 (1855); *The Keokuk,* 76 U.S. (9 Wall.) 517, 519, 19 L.Ed. 744 (1869); *Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 498, 43 S.Ct. 172, 173, 67 L.Ed. 364 (1923). Advance thus invokes the "executory contract doctrine" which precludes the creation of a maritime lien for breach of a contract that is merely executory.

■ This doctrine reflects the special nature of the maritime lien which rests upon the legal fiction of the personality of the vessel. A maritime lien is not, like a dryland lien, a security interest arising from the personal obligation of the vessel's owner under a contract. A maritime lien is based instead on the fiction that the vessel may be a *defendant* in a breach of contract action when the vessel itself has begun to perform under the contract. *See Krauss Bros. v. Dimon S.S. Corp.,* 290 U.S. 117, 121, 54 S.Ct. 105, 106, 78 L.Ed. 216 (1933); *Osaka Shosen,* 260 U.S. at 498, 43 S.Ct. at 173; *Vandewater v. Steamship Yankee Blade,* 60 U.S. (19 How.) 82, 90, 15 L.Ed. 554 (1856); 1 *Benedict on Admiralty* § 188 (7th rev.ed. 1988).

While the legal fiction of the personality of the vessel may seem anachronistic, it is grounded in sound policy. The existence of a maritime lien affords special protection to the party who has been injured by a breach of contract and provides the basis for *in rem* admiralty jurisdiction. The injured party may arrest the vessel to ensure that should it prevail in the breach of contract action, it will be able to satisfy its judgment. The lien holder is therefore placed in a privileged position in relation to other creditors who do not have the security of a lien and must proceed *in personam* against the owner of the vessel. Consequently, the lien "is *stricti juris* and cannot be extended by construction, analogy or inference." *Osaka Shosen,* 260 U.S. at 499, 43 S.Ct. at 174.

1. Existence of a Maritime Lien for Breach of a Charter Party

■ Advance maintains that in holding that a maritime lien may arise from the breach of a charter party *without* a union of ship and cargo, the district court impermissibly extended maritime liens beyond the context of contracts of affreightment— the only type of maritime contract that the Supreme Court has recognized as giving rise to a lien.[4]

We disagree. While Advance is correct that the vast majority of Supreme Court cases have involved contracts of affreightment, the district court aptly observed that those cases involved *in rem* actions brought by cargo owners for breach of contracts of affreightment evidenced by bills of lading and/or voyage charters and not by charterers alleging breach of a time charter.[5] *See e.g., Krauss Bros.,* 290 U.S. at 120, 54 S.Ct. at 105 (lien for overpayment of freight); *The Keokuk,* 76 U.S. (9 Wall.) at 519 (owner of cargo has no lien when cargo not in control of vessel); *The Lady Franklin,* 75 U.S. (8 Wall.) 325, 329, 19 L.Ed. 455 (1868) (libellant had no lien for value of cargo absent union of ship and cargo); *Bulkley v. Naumkeag Steam Cotton Co.,* 65 U.S. (24 How.) 386, 391, 16 L.Ed. 599 (1860) (lien for lost or damaged cargo where cargo *effectively* deliv-

---

**4.** The district court stated that Advance did not appear to dispute "the general statement that the breach of a charter party creates a lien in certain cases." 673 F.Supp. at 801. At oral argument, however, Advance emphasized that historically maritime liens are created only by the breach of a contract of affreightment and suggested that cases recognizing a lien for breach of a charter party that is *not* a contract of affreightment were wrongly decided.

**5.** Professors Gilmore and Black make the more general statement that contracts of affreightment may be evidenced by bills of lading or charter parties, thus implying that in certain cases a time charter may be deemed a contract of affreightment. G. Gilmore & C. Black, 637, *The Law of Admiralty* (2d ed.1975). This point is addressed more fully above.

ered to vessel). The Supreme Court has never held that contracts of affreightment are the *only* maritime contracts which give rise to a lien. Rather, as the district court held, a contract of affreightment is only a subset of the larger universe of maritime contracts which may give rise to a maritime lien.

Advance concedes that the district court's conclusion on this point was effectively compelled by our decision in *International Marine Towing* in which we joined the Second Circuit in holding that there is a maritime lien for breach of a charter party —as distinct from a contract of affreightment. *International Marine Towing*, 722 F.2d at 130–31 & n. 8 (breach of bareboat charter may give rise to maritime lien); *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1027 (2d Cir.1973) (breach of time charter gave rise to a maritime lien). Similarly, the leading authorities in admiralty law have recognized that although a contract of affreightment may be *evidenced* by a charter party, a lien may arise from the breach of a charter party distinct from a contract of affreightment. G. Gilmore & C. Black, *The Law of Admiralty* 631 (2d ed. 1975) ("*As in the case of liens between vessel and cargo,* liens arise for breach of charter-party in either direction.") (emphasis added); *See also* 1 *Benedict on Admiralty, supra,* § 188, at 12–41 ("all maritime contracts may ultimately form the basis of a lien").

Consequently, we hold that the district court properly applied our reasoning in *International Marine Towing* to the case at hand and concluded correctly that breach of a time charter may create a maritime lien.

### 2. Application of the Executory Contract Doctrine

We find further that the district court concluded correctly that the contract in this case was not executory.

■ The point at which the vessel itself is deemed to have commenced "performance" sufficient to remove the contract from executory status varies with the type of contract involved. G. Gilmore & C. Black, *supra,* at 636; 1 *Benedict on Admiralty, supra,* § 188, at 12–39–43.

■ Advance is correct that a lien for breach of a contract to carry cargo is considered to arise from the *mutual and reciprocal* obligation of ship and cargo. That is, cargo has an obligation to ship and vice versa. The mutual duty does not attach "until the cargo is on board or in the master's custody." *Osaka Shosen,* 260 U.S. at 499–500, 43 S.Ct. at 174. Until that time, the contract of affreightment is merely executory and the injured party must proceed *in personam.* Advance maintains, as it did below, that time charters are contracts of affreightment and that a time charter is therefore executory until there is a union of ship and cargo. *See Interocean Shipping Co. v. M/V Lygaria,* 512 F.Supp. 960 (D.Md.1981).

The district court properly rejected this argument. In *International Marine Towing* we relied on the Second Circuit's reasoning in *Rainbow* and noted that a bareboat charter, like the time charter at issue in *Rainbow,* ceases to be executory when the vessel is delivered to the charterer. 722 F.2d at 133 n. 8; *see Rainbow,* 480 F.2d at 1027 n. 6. Similarly, Professors Gilmore and Black note that "[u]nder charter parties, the point of 'execution' would be the delivery of the vessel under the charter: mere refusal to deliver would give rise only to liability *in personam* and it would make no difference if the charter hire had been paid in advance." [6] G. Gilmore & C. Black, *supra,* at 636; *see also* 1 *Benedict on Admiralty, supra,* § 188, at 12–40 ("the

---

**6.** Advance's contention that erroneous dicta in *Rainbow* provided the sole basis for our dicta in *International Marine Towing* and for the position of commentators in the field is belied by the fact that the Second Circuit relied in *Rainbow* on identical language appearing in an earlier edition of Gilmore & Black's treatise. 480 F.2d at 1027 n. 6. The notion that there is a lien

for breach of a charter party and that a time charter ceases to be executory when the vessel is delivered to the charterer is not a break with tradition, but the continuation of a line of precedent distinct from the Supreme Court precedent involving liens for the breach of contracts of affreightment. *See e.g., The Oceano,* 148 F. 131, 133 (S.D.N.Y.1906).

owner who charters his ship cannot be bound *in rem* for violation of the charter agreement until the charterer has actually taken possession") (citing district court opinion in this case).

These authorities recognize that for purposes of the executory contract doctrine, there is a distinction between an action by a charterer for breach of a charter party and an action by a cargo owner for breach of a contract of affreightment evidenced by bills of lading or a charter party. The district court properly grounded this distinction in the nature of the underlying contracts and the obligations they create. The district court reasoned that a time charter should not be equated with a contract of affreightment because the object of a time charter is not necessarily the transport of cargo. A time charterer does not pay freight to the vessel owner for the safe transport of a specific cargo to a specific destination, but pays instead for the use of the vessel for a specified period of time—the intended use of the vessel may not include the transportation of any cargo at all or may be to make a series of voyages, carrying different cargo to various destinations. 673 F.Supp. at 803; *see also* G. Gilmore & C. Black, *supra*, at 193–94 (distinguishing voyage charters and time charters). The district court concluded that given the nature of a time charter, "it makes no sense to determine that the charter is executory until the loading of the cargo." 673 F.Supp. at 804. Rather, the vessel begins performance of the contract when it "is placed at the charterer's disposal." *Id.*

We agree with both the district court's conclusion and its reasoning.

### 3. The *Belvedere* case: When is a Time Charter a Contract of Affreightment?

Advance maintains that even if the district court's reasoning was logically compelled by our dicta in *International Marine Towing*, we are foreclosed by our earlier decision in *Belvedere v. Compania Plomari de Vapores, S.A.*, 189 F.2d 148 (5th Cir.1951), from affirming the district court's order. Advance contends that the facts of *Belvedere* are virtually identical to those of this case: a charterer brought an *in rem* action for breach of a time charter executed on a New York Produce Exchange form identical to the form involved in this case; the charter hire had been paid in advance; and the vessel had been delivered to the charterer but due to mechanical problems never reached the port where it was to take on cargo. The court in *Belvedere*, however, held that the charterer's libel was properly dismissed: "No cargo was ever loaded, nor was the vessel ever ready to receive cargo at the loading port, in accordance with the charter party. The contract of affreightment remained wholly executory." *Id.* at 149.

Advance maintains that *Belvedere* stands for the proposition that a time charter is a contract of affreightment which remains executory until there is a union of ship and cargo. We do not read *Belvedere* so broadly.[7]

While the charterer in *Belvedere* did seek to recover sums advanced for the charter hire, the charterer was also the owner of the cargo and sought to recover damages for the cargo of bananas that spoiled as a result of the vessel's failure to reach the port. The central claim asserted in *Belvedere* thus appeared to be identical to that of an *owner of cargo* alleging breach of a

---

**7.** The district court noted that "certain dictum in *Rainbow*" expressly disapproved of *Belvedere*. 673 F.Supp. at 802 n. 9 (quoting *Rainbow*, 480 F.2d at 1027 n. 6 ("although it would not matter in this case, we disagree with the court in *Belvedere* ... to the extent that it felt that a time charter was executory until the first cargo was loaded.")). The district court dismissed the significance of the Second Circuit's language on the ground that *Belvedere* itself "did not mention *time* charters at all, and thus there can be no actual disagreement."

While we agree with the district court that the holding in *Belvedere* did not rest on any express discussion of the nature of time charters, we cannot ignore the fact that the charter at issue in *Belvedere* was a time charter, executed on the same New York Produce Exchange form used in this case. Consequently, we concede that to the limited extent outlined above, *Belvedere* does have some bearing on the rights of a charterer under a time charter.

contract of affreightment. Indeed, the court repeated the rule announced in *The Keokuk* that "the lien of the *cargo owner* upon the ship is limited by the corresponding and reciprocal rights of the shipowner on the cargo." 189 F.2d at 150 (quoting *The Keokuk,* 76 U.S. (9 Wall.) at 519) (emphasis added). The court appears to have assumed, without expressly deciding, that the time charter involved in *Belvedere* was a contract of affreightment. There is no indication that the court was presented with or considered the argument advanced in this case that a time charter is distinct in its very nature from a contract of affreightment and consequently ceases to be executory at a different point in time.

We need not consider, however, whether *Belvedere* is erroneous in its failure to consider these matters because nowhere does the court hold, as appellant suggests, that time charters are *ipso facto* contracts of affreightment. More importantly, *Belvedere* does not address the situation in which the charterer is not the owner of the cargo. When, as in *Belvedere,* the charterer is also the owner or consignee of the cargo and asserts a claim relating to the cargo, the charterer in effect asserts a breach not only of the time charter *qua* time charter but also of the contract of affreightment evidenced by the time charter. When, however, the charterer has, as in this case, entered into subcharters with the cargo owners, the charterer asserts a breach only of the time charter *qua* time charter and not of a contract of affreightment *evidenced* by a time charter. *See* M. Wilford, T. Coghlin, N. Healy & J. Kimball, *Time Charters* 342 (2d ed.1982) (distinguishing liens arising from breach of a time charter and liens relating to cargo where the cargo is owned by the charterer). We therefore read *Belvedere* as holding only that a contract of affreightment *may* be evidenced

by a time charter and that in that case, the contract remains executory until there is a union of ship and cargo.

Based on the foregoing analysis, we must also reject Advance's contention that this *particular* time charter was a contract of affreightment—EAST properly asserts a breach of a time charter itself and not a breach of a contract of affreightment evidenced by a time charter.

We therefore agree with the district court that a time charterer may have a lien for breach of the charter party and that at least when the charterer does not assert a claim for breach of a contract of affreightment *evidenced by* a time charter, the charter ceases to be executory when the vessel is placed at the charterer's disposal. This holding is not contrary to *Belvedere* and leaves for another day a reevaluation of *Belvedere*'s central holding.

**D.** *In Rem* Jurisdiction to Order Arbitration

■ Finally, Advance asserts that *in rem* jurisdiction is not an adequate basis on which to refer parties to arbitration. The district court correctly held that it had such jurisdiction under Section 8 of the Federal Arbitration Act, which provides that,

If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then ... the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

9 U.S.C. § 8.[8] Under article II(3) of the Convention, the district court similarly had

8. There has been some uncertainty regarding a district court's authority under Section 4 of the Act to order arbitration outside its district. Section 4 provides both that the arbitration be held in the district in which the court sits and that the arbitration be held in accordance with the terms of the agreement. *Ashland Oil,* 817 F.2d at 330. Generally, however, courts have given priority to the terms of the arbitration agree-

ment unless a party is found to have waived its right to the benefit of a forum selection clause. *Id.* at 330–31 (citing cases). Any ambiguity in Section 4 is, in any event, eliminated by 9 U.S.C. § 206 which authorizes a district court to order arbitration in accordance with the agreement "at any place therein provided for, whether that place is within or without the United States." Because we have held that this agreement is

the authority, and indeed a duty, to refer the parties to arbitration. 9 U.S.C. § 206. Because Advance submitted to the court's *in personam* jurisdiction, we need not decide whether *in rem* jurisdiction is a sufficient basis on which to refer parties to arbitration under the Convention. Advance's contention that the district court did not have jurisdiction to refer the parties to arbitration is therefore wholly without merit.

### III.

For the foregoing reasons, the order of the district court is AFFIRMED.

governed by the Convention, the district court had authority under this provision to refer the parties to arbitration in London, as provided by the charter party.