**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 00-30380

(Summary Calendar)
_____


GLOBAL TOWING, L.L.C.,

                          Plaintiff-Appellant,

versus


MARINE TECHNICAL SERVICES, INC., ETC; ET AL,


                          Defendants,


AMOCO ENERGY COMPANY OF TRINIDAD AND TOBAGO,
formerly Trinidad Oil Company,


                          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 98-CV-1765-N

_____

December 15, 2000

Before EMILIO M. GARZA, STEWART and PARKER, Circuit Judges.

PER CURIAM:[*]

Global Towing, L.L.C. ("Global") appeals the district court's ruling that Anthony Aming did not have actual or apparent authority to sign a financial guarantee on behalf of Amoco Energy Company of Trinidad and Tobago ("Amoco"). We affirm.

This dispute arises from Amoco's gas and oil exploration offshore of Trinidad. To help place a drilling rig, Amoco entered into an oral agreement with Marine Technical Services, Inc. ("MTS") to perform a site hazard survey. Larry Tiezzi, the vice president of exploration at Amoco, and Peter Kane, the president of MTS, later signed a written contract formalizing the deal. MTS, in turn, enlisted Global as a third-party subcontractor to survey four grids in Trinidad. Amoco was not a party to this subcontract.

During the course of the project, MTS encountered financial difficulties, and it stopped making payments to Global. To be precise, MTS failed to pay nearly $400,000 owed to Global under their subcontract. Worried by MTS' precarious financial situation, Michael Blake, the president of Global, called Kane of MTS to demand a guarantee of the due payments. Kane told Blake to ask Amoco to ensure this "guarantee." Kane specifically told Blake to contact Anthony Aming, an Amoco senior geophysicist who helped oversee this project in Trinidad.

Blake called Aming and asked that Amoco vouch for MTS' overdue payments. Blake threatened to prevent MTS from using Global's vessels unless Aming signed a letter which stated that Amoco would pay MTS' indebtedness to Global. Aming signed the letter, describing his position as "chief geophysicist."

---

[*] Pursuant to Fifth Circuit Rule 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

-2-

Meanwhile, Amoco and MTS became embroiled in a dispute over how much Amoco owed MTS. By this time, Global had filed suit against Amoco to enforce the guarantee letter signed by Aming. Amoco and MTS eventually reached a settlement, where Amoco paid $40,000 to MTS and reserved an additional $183,478 in a reserve account in case that Global prevailed in its suit.[1]

In district court, Global sought damages of nearly $400,000 from Amoco, claiming that Aming had contractually bound Amoco to make the overdue payment. Amoco responded that Aming did not have the authority to sign such a contract, and that in fact, he never informed his superiors about the letter. The district court held a non-jury trial and found that Aming had neither the actual nor apparent authority to bind Amoco.

In admiralty cases, we review the district court's factual findings for clear error and questions of law *de novo*. *See E.A.S.T., Inc. of Stamford, Connecticut v. M/V Alaia*, 876 F.2d 1168, 1171 (5th Cir. 1989) (citations omitted). We further note that federal maritime law incorporates the basic principles of agency law. *See MTO Maritime Transport Overseas, Inc. v. McLendon Forwarding Co.,* 837 F.2d 215, 218 (5th Cir. 1988).

The district court correctly held that Aming did not have actual authority to sign the financial guarantee on behalf of Amoco. There are two classes of actual authority: expressed and implied. "An express agency is the actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as fact is proved by deductions or inferences." *Esso Int'l, Inc. v. SS Captain John*, 443 F.2d 1144, 1148 (5th Cir. 1971). Global failed to prove either express or implied actual agency.

First, the district court made a factual finding that Aming, as a mere senior geophysicist, only

---

[1] MTS has since filed for Chapter 7 bankruptcy.

had power over "operational" aspects of the survey, and thus did not have the express actual authority to make financial guarantees. The authority to sign binding contracts was vested in Diana Friedhoff-Miller, the project manager in charge of the survey. In making this factual determination, the court relied on the testimony of Stephen Brady, an Amoco business analyst who had knowledge of the company's corporate hierarchy. This finding of fact leads to the inevitable legal conclusion that Aming did not have express actual authority to sign the guarantee letter.

Global fails to show that the district court's factual findings are clearly erroneous. It offers several lines of evidence which allegedly show that Amoco vested Aming with actual authority. The district court opinion, however, refuted each and one of them, relying on Brady's testimony. First, Global refers to an internal e-mail that said that Aming was "responsible" for the Trinidad survey. The district court, however, found that the responsibility included only to the operational aspects of the exploration. Second, Global claims that the contract between Amoco and MTS referred to Aming as the "contact" individual. The district court downplayed its significance. It cited Brady's testimony that the designation only meant that invoices would be sent to Aming, not that he would approve it. Third, Global offers evidence that some non-Amoco employees had called Aming the "project manager." But the colloquial title given by non-Amoco employees does not vitiate that Amoco itself had classified Aming as a "geophysicist." In essence, Global's argument boils down to Brady's credibility: it claims that he simply cannot be believed. The district court heard live testimony from witnesses, weighed their credibility, and ultimately found Brady's explanation credible. Global has simply failed to show that the district court was clearly erroneous in making these findings of fact.

Second, Global contends that Aming had implied actual authority to sign the guarantee letter

on behalf of Amoco. It again tries to dispute the district court's findings of fact without showing why they were clearly erroneous. For example, it complains that the districtcourt "discount[ed]...the testimony of Peter Kane, Andrea Belcher and Robert Mercarini and focuse[d] solely on one witness, Stephen Brady." But that is the precise role of a district court))to weigh and judge each witness' credibility.[2] Indeed, the district court at one point noted that it "was left with the distinct impression that [Global president] Blake did not really believe" his own testimony. Global simply has not established that Amoco had implicitly clothed Aming with the authority to sign contracts. *Esso*, 443 F.2d at 1146.

Third, Global maintains that Aming had the apparent authority to sign the guarantee letter. "Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111-12 (5th Cir. 1985) (citing RESTATEMENT (SECOND) OF AGENCY § 27). Put another way, Global needs to prove that (1) Amoco's conduct caused Global to believe that its agent, Aming, had authority; and (2) it reasonably relied upon Amoco's conduct.

Global offers scant evidence that Amoco led Global to believe that Aming had apparent authority. It alleges that Amoco in its internal e-mail and memorandum had designated Aming as a "project manager." Global further alleges that Aming signed a draft contract with MTS on behalf of Amoco, and that MTS began work on the survey, despite the fact that a final contract (signed by

---

[2]    The district court also had good reason to give more weight to Brady's testimony: as an Amoco business analyst, he is intimately knowledgeable about Amoco's corporate hierarchy. On the other hand, Kane, as the president of MTS, presumably has limited knowledge of each Amoco employee's authority and power.

Amoco's Tiezzi) would not be formalized until later. This allegedly shows that third parties would believe that Aming had authority to sign contracts. The record does not reflect these allegations. First, the e-mail is the same one mentioned previously which only said that Aming was "responsible" for operational matters. Second, the memorandum at one point does refer to Aming as a "project [m]anager," but on top of the memorandum in bold and underlined text, it describes Aming as a "staff geologist." Third, Aming did sign a draft contract, but it was not considered binding; indeed, the president of MTS in his deposition suggested that he was "very worried" and "very concerned" that the draft contract was not binding on Amoco.

Most importantly though, Global misunderstands the concept of apparent authority. For Amoco to be bound by Aming's action, "the principal [i.e., Amoco] must first act to manifest the alleged agent's authority to an innocent third party." *Mary Adams & Assoc. v. Rosenblat*, 539 So.2d 860, 863 (La.Ct.App. 1989) (citations omitted). Here, Global offers *internal* Amoco e-mail and memoranda (propounded through discovery) as evidence. In other words, Amoco could not have manifested Aming's authority to Global through these documents because Global never even saw them until it received them during discovery. Similarly, Global has not provided any evidence that, at the time it signed the guarantee letter with Aming, it knew that MTS had begun its survey work, despite only having a draft contract.

Furthermore, Global fails to show that he reasonably relied on that apparent authority. Global must show that it did "not blindly rely upon the assertions of an agent" because it has the "duty to inquire into the nature and extent of the agent's power." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, 2000 WL 726880, *5 (E.D. La. 2000); *see also Richard A. Cheramie Enter., Inc. v. Mt. Airy Refining Co.,* 708 F.2d 156, 158 (5th Cir. 1983) ("[A]n alleged agent's

statements cannot establish an agency relationship.") Global never inquired into the extent of Aming's power. In fact, it admitted that it did not know what the appellation "senior geophysicist" meant. Instead, Global relied solely on the words of Aming himself and of Kane, the president of MTS, who not surprisingly did not know the corporate hierarchy of Amoco.

Finally, Global claims that Amoco ratified Aming's actions and conferred him authority by (1) making payments to MTS for survey work done pursuant to a draft contract signed by Aming; and (2) by reserving nearly $200,000 for Global after it became aware of Aming's guarantee letter. *See 3 A's Towing Co. v. P&A Well Service, Inc.*, 642 F.2d 756 (5th Cir. 1981) (holding that an agent's unauthorized acts can be implicitly ratified by the principal). Global cannot raise this issue on appeal because it waived it. *See Reynolds Metal Co. v. Westinghouse Electric Corp.*, 758 F.2d 1073 (5th Cir. 1985) (holding that a failure to raise an issue in district court precludes a party from raising it on appeal). Although Global did mention some of the facts underlying this ratification claim in its pre-trial memorandum, it failed to raise this issue when it submitted to the court its "List of Issues to Be Resolved at Trial" and its "Proposed Findings of Facts and Conclusion of Law."

Even if Global had not waived it, its argument would fail. Global's alleges that Amoco ratified Aming's authority by making payments to MTS for survey work based on the draft contract signed by Aming. As a factual matter, Amoco made the payments to MTS only *after* its vice president, Larry Tiezzi, signed a formal contract. As mentioned before, MTS' president did not believe that Aming's signature on the draft contract would bind Amoco. Global distorts the record by suggesting that Tiezzi's signature ratified Aming's conduct. Moreover, even if we assume that Amoco had ratified Aming's signature in the draft contract with MTS, it is difficult to see what significance it has in regards to Aming's signature in a guarantee letter with Global. An earlier

ratification of an unauthorized act does not necessarily ratify all future unauthorized acts.

Global's second allegation of ratification is similarly baseless. It contends that Amoco ratified Aming's guarantee letter by withholding $200,000 from MTS and reserving it for Global in case the district court ruled against Amoco. Amoco had done this pursuant to a settlement agreement with MTS. Global's reliance on *3 A's Towing* for this proposition is inapposite. *3 A's Towing* states that an unauthorized act can be ratified only if a "corporate personnel with the authority to bind the corporation acquire, or are charged with, knowledge of the unauthorized act." *Id.* at 758. Global alleges that Amoco knew about the guarantee letter because Blake had mentioned it to Amoco's Brady. However, Global fails to dispute that Brady, as a business analyst, does not have the authority to bind Amoco.

Furthermore, in *3 A's Towing*, the principal ratified the agent's unauthorized cancellation of a contract by later affirmatively cancelling the contract. In contrast, Amoco never made any actual payments to Global, but Global nevertheless alleges that Amoco "ratified" Aming's guarantee letter by reserving money in case that it suffered an adverse judgment. It strains the holding of *3 A's Towing* to construe Amoco's settlement deal with MTS as a ratification of Aming's guarantee letter.

AFFIRMED.